IN RE DETERMINATION OF EXECUTIVE COMMISSION ON ETHI-
CAL STANDARDS RE: APPEARANCE OF RUTGERS ATTOR-
NEYS BEFORE THE COUNCIL ON AFFORDABLE HOUSING
ON BEHALF OF THE CIVIC LEAGUE, PLAINTIFFS.

Argued February 27, 1989—Decided August 2, 1989.

*Frank Askin* argued the cause for appellant Civic League of Greater New Brunswick (*John Payne* and *Barbara Stark,* attorneys; *Arthur Kinoy,* of counsel).

*Lewis A. Scheindlin,* Deputy Attorney General, argued the cause for respondent Executive Commission on Ethical Standards (*Peter N. Perretti, Jr.,* Attorney General of New Jersey, attorney; *Benjamin Clarke,* Deputy Attorney General, of counsel).

*John P. Thurber,* Assistant Deputy Public Advocate, argued the cause on behalf of *amicus curiae* Public Advocate of the State of New Jersey (*Alfred A. Slocum,* Public Advocate, attorney).

*Nadine Taub* and *Patricia E. Rousseau* submitted a brief on behalf of *amicus curiae* Urban Legal Clinic, Environmental

Law Clinic, Women's Rights Litigation Clinic, and Prisoners' Rights Legal Clinic.

*Bernard Kenneth Freamon* submitted a brief on behalf of *amicus curiae* Society of American Law Teachers (*Mr. Freamon*, attorney; *Charles D. Wiesselberg*, a member of the California bar, of counsel).

*Paul Schachter* submitted a brief on behalf of *amicus curiae* American Association of University Professors (*Reinhardt & Schachter*, attorneys; *Stefan H. Krieger*, a member of the Texas bar, of counsel).

*Bennet D. Zurofsky* submitted a brief on behalf of *amicus curiae* Association of American Law Schools (*Reitman, Parsonnet, Maisel & Duggan*, attorneys).

The opinion of the Court was delivered by

O'HERN, J.

█ The question in this case is whether a Rutgers law professor conducting a clinical teaching program is to be regarded as a "State employee" for purposes of the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 to –27. Specifically, the question is whether the clinical teaching program is prohibited from carrying out its legal mission before a State administrative agency, in this case, the Council on Affordable Housing (COAH). A clinical teaching program at a privately-chartered institution of legal education undoubtedly would be able to appear before State courts and State agencies. We do not believe that the Legislature ever would have intended to disable a clinical education program at our State University. Accordingly, we reverse the judgment of the Appellate Division holding that representation of clients before such State agencies by the clinical legal program and the teaching supervisor is a violation of the New Jersey Conflicts of Interest Law.

I

Clinical training is one of the most significant developments in legal education. Generations of law students, trained on the

case method, were believed to be skilled in analysis but unskilled in serving client needs. The response has been for law schools to afford students "hands-on" experience in representing clients. That means participating in client interviews, investigations, preparation of pleadings, and, in permitted circumstances, appearing in court. We have changed our Court Rules to permit the supervised practice of law by third-year law students and recent graduates who are not yet admitted to the bar while participating in approved programs. See *R.* 1:21–3(b).

As noted, the Rule permits students, under the supervision of a member of the bar, to represent clients in need of legal services. For example, the Rutgers Environmental Law Clinic's mission is to provide students with an introduction to the nature of environmental law practice. To do so, it must interact with the Department of Environmental Protection as well as other State administrative agencies. In order to accept the Commission's ruling, we would have to assume that an environmental-law clinic at a State University (unlike one at a privately-funded university) would not be able to interact with any of the agencies essential to such practice. Nor would the Women's Rights Litigation Clinic of Rutgers University be able to represent women subjected to sexual harassment in related employment hearings or to act in child-advocacy issues before the Division of Youth and Family Services, the State agency that provides protective services for children. Nor would the Urban Legal Clinic at Rutgers be able to handle its clients' housing, employment, and income-assistance claims when they must go before the operative State agencies. Nor, finally, would the Rutgers University School of Law Constitutional Litigation Clinic (Clinic) be able to appear before COAH. We cannot attribute such an intention to the Legislature.

## II

We gather this insight from considering the purposes of the conflicts law. In 1969, the Legislature was concerned with the

practice of its members and other public officials appearing before the agencies of government that were under regulation. In 1971, after substantial debate, the Legislature enacted the present conflicts law, declaring that

> [i]n our representative form of government, it is essential that the conduct of public officials and employees shall hold the respect and confidence of the people. Public officials must, therefore, avoid conduct which is in violation of their public trust or which creates a justifiable impression among the public that such trust is being violated. [*N.J.S.A.* 52:13D–12(a).]

Governor Cahill, on signing the bill, stated that

> the State will benefit by the removal, to a large degree, of situations of conflicts of interests on the part of members of the Legislature and State officers and employees. Equally as important, this bill will remove the appearance of an opportunity for the exertion of undue influence.
>
> While in many instances no actual conflict of interest or undue influence does exist, the appearance of the same is most harmful to our public image. By removing situations of conflict of interest, opportunities for conflict of interest, and the appearance of conflict of interest and undue influence, the respect of our citizens for public officials will be renewed. [Remarks in Connection with the Signing of S–825 (2nd OCR) at 4 (June 2, 1971) (hereinafter Remarks of Governor Cahill).]

The particular evil that occasioned the passage of the conflicts law was the appearance of impropriety by members of the official family of State Government representing interests before agencies of the very government with which they were associated. There is a familiar concern at both state and national levels of trading this influence in the public sphere to the disadvantage or to the apparent disadvantage of the public.

The section of the conflicts law currently at issue provides, in relevant part that

> [n]o State officer or employee * * * shall represent, appear for, or negotiate on behalf of, or agree to represent, appear for, or negotiate on behalf of, any person or party other than the State in connection with any cause, proceeding, application or other matter pending before any State agency * * *. [*N.J.S.A.* 52:13D–16(b).]

Section 16(c) of the conflicts law exempts certain agencies from the foregoing provision, but the COAH is not listed among them. Further, the statute broadly defines "State officer or employee" as, in relevant part, "any person * * * holding an

office or employment in a State agency * * *." *N.J.S.A.* 52:13D–13(b). "State agency" similarly is defined broadly as any of the principal departments in the Executive Branch of the State Government, and any division, board, bureau, office, commission or other instrumentality within or created by such department, the Legislature of the State and any office, board, bureau or commission within or created by the Legislative Branch, * * * and any independent State authority, commission, instrumentality or agency. A county or municipality shall not be deemed an agency or instrumentality of the State. [*N.J.S.A.* 52:13D–13(a).]

## III

We come now to the position of a professor at a State University and must try to assimilate that position within the framework of the statute. Obviously, the professor is not an employee of any of the "principal departments in the Executive Branch of the State Government," but the language of the statute might be interpreted to extend to Rutgers. It holds a legislative charter. Does that make it a State "instrumentality" for purposes of the State's conflicts law? Heretofore, our courts have resolved the question of whether general state statutes apply to Rutgers by considering both the purposes of the general program and the purposes of the Rutgers legislative charter. *See Rutgers, The State University v. Piluso,* 60 *N.J.* 142 (1972). Our task is to have the law make sense: "it is a venerable principle that a law will not be interpreted to produce absurd results." *K Mart Corp. v. Cartier, Inc.,* 486 *U.S.* 281, —— n. 2, 108 *S.Ct.* 1811, 1816 n. 2, 100 *L.Ed.*2d 313, 345 n. 2 (1988) (Scalia, J., concurring in part and dissenting in part).[1] We must ask whether the teaching role of a Rutgers

---

[1]The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire—'for he is not to be hanged because he would not stay to be burnt.'

University professor evokes any of those concerns that prompted the Legislature to enact conflict-of-interest provisions regulating the conduct of New Jersey public officials, and whether application of the law would frustrate the purposes of the Rutgers charter.

We begin by noting the entirely coincidental circumstance that occasions the presence of the putative "State employee," the university professor, before the State agency. It is a circumstance that contradicts any suggestion of an "appearance of an opportunity for the exertion of undue influence." Remarks of Governor Cahill, *supra,* at 4. Rather, this situation arises from the unique circumstances of the enactment of the Fair Housing Act of 1985, *N.J.S.A.* 52:27D–301 to –329. For some years prior to the act, the Rutgers Clinic had been representing the Civic League, a nonprofit organization representing the interests of low- and moderate-income persons, in certain claims before the Superior Court. At no time was the representation by the University or its teaching clinic ever questioned as presenting any appearance of impropriety. Following the enactment of the Fair Housing Act, and in accordance with its provisions, litigation was transferred to the COAH for exhaustion of its administrative procedures. *See generally Hills Dev. Co. v. Township of Bernards,* 103 *N.J.* 1 (1986) (upholding and explaining the Fair Housing Act, and concluding that on the facts before it none of the cases satisfied the "manifest injustice" standard required to avoid transfer to the COAH).

That this happenstance would create a conflict of interest could hardly have been the intention of the Legislature. Given the correlative relationship between the agency process and the judicial process under the Act, we would have to assume that the Legislature intended that a public-interest client would be

[*K Mart Corp. v. Cartier, Inc., supra,* 486 *U.S.* at —— n. 2, 108 *S.Ct.* at 1816 n. 2, 100 *L.Ed.*2d at 345 n. 2 (Scalia, J., concurring in part and dissenting in part) (quoting *United States v. Kirby,* 7 *Wall* 482, 487, 19 *L.Ed.* 278 (1869)).]

expected to change representation as it went in and out of COAH.

In addition, we note the unique status of Rutgers, The State University. For some 190 years, it had occupied an essentially independent status. *See generally Trustees of Rutgers College v. Richman,* 41 *N.J.Super.* 259, 265–82 (Ch.Div.1956) (outlining the history of the University from its chartering as Queen's–College in 1766 until 1956). Accordingly, the absorption of Rutgers University within the framework of State-supported education has been marked by an overriding concern for the academic freedom of one of the nation's oldest and greatest universities. The fact that there is State involvement in education should never be a disadvantage. The Governor of the State of New Jersey is trustee, *ex officio,* of Princeton University. There is no loss of academic freedom in that. The reorganization of Rutgers as the State University in 1956 was accompanied by a declaration that

> the corporation and the university shall be and continue to be given a high degree of self-government and that the government and conduct of the corporation and the university shall be free of partisanship. [*N.J.S.A.* 18A:65–27(I)(a).]

The reorganization statute also provides that "the powers granted to the corporation or the boards [of trustees] or reasonably implied, may be exercised without recourse or reference to any department or agency of the state, except as otherwise expressly provided by this chapter or other applicable statutes." *N.J.S.A.* 18A:65–28. It has been said that Rutgers is a unique body within our State government:

> [W]e find here created a hybrid institution—at one and the same time private and public, with the State being granted a major voice in management, and the designation "State University"; and the institution being granted private autonomy and control of physical properties and assets. [*Richman, supra,* 41 *N.J.Super.* at 289–90.]

We have previously recognized the Legislature's intent "that the growth and development of Rutgers, as a public university for the benefit of all the people of the state, was not to be thwarted or restricted * * *." *Rutgers, The State University v. Piluso, supra,* 60 *N.J.* at 158.

 While it has to some extent been regarded as a State agency for the purpose of immunity from local land-use regulations, *ibid.*, and from property taxation, *Rutgers, The State University v. Piscataway Township*, 1 *N.J.Tax* 164 (Tax Ct. 1980), in other circumstances it has not been viewed as synonymous with the State. It is capable of being sued and has the power to sue, and therefore it is not considered part of the State in regard to the New Jersey Contractual Liability Act, *N.J.S.A.* 59:13-1 to -10. *Frank Briscoe Co. v. Rutgers, The State University*, 130 *N.J.Super.* 493 (Law Div.1974). Nor is it considered an arm of the State entitled to eleventh-amendment immunity from suit. *Kovats v. Rutgers, The State University*, 822 *F.*2d 1303 (3d Cir.1987). Finally, in our most recent examination of the issue in *Fuchilla v. Layman*, 109 *N.J.* 319 *cert. denied,* —— U.S. ——, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988), it was not considered an alter-ego of the State but rather a "person" subject to liability for purposes of a federal action under 42 *U.S.C.A.* § 1983.

All of this independence accords with the idea of a university as "guilds of scholars * * * responsible only to themselves." *Snitow v. Rutgers University*, 103 *N.J.* 116, 122 (1986) (quoting *NLRB v. Yeshiva University*, 444 *U.S.* 672, 680, 100 *S.Ct.* 856, 861, 63 *L.Ed.*2d 115, 124 (1980)). In *Snitow* we recognized the fundamental importance of academic freedom in our society:

> The concept of "[a]cademic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment." *Regents of the University of California v. Bakke*, 438 *U.S.* 265, 312, 98 *S.Ct.* 2733, 2760, 57 *L.Ed.*2d 750, 785 (1978) (Powell, J., announcing Court's judgment and expressing his views of case). " '[T]he four essential freedoms' of a university" have been said to include the freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 *U.S.* 234, 263, 77 *S.Ct.* 1203, 1218, 1 *L.Ed.*2d 1311, 1332 (1957) (Frankfurter, J., concurring) (citation omitted). [*Ibid.*]

To characterize one of these scholars, for all purposes, as the equivalent of a "State employee" is to misperceive history and to traduce legislative purpose.

In *Democratic Party of New Jersey, Inc. v. Collins,* 109 *N.J.* 521, 522 (1987), we recognized that it was not clear that members of the State Legislature who were tenured faculty members of State universities held a "position of profit" within the Executive Branch of Government. Accordingly, we remanded that case for further factual findings on the actual appearances or possible appearances of impropriety in the relationships of the parties. *Ibid.* If anything, there is much less potential for the appearance of impropriety in the relationship of a Rutgers University professor appearing before State agencies. There is simply no budgetary or fiscal relationship between the parties. At oral argument, we specifically requested the Attorney General to illustrate the instances in which an "appearance of impropriety" would be present to a well-informed observer. *See Higgins v. Advisory Comm. on Professional Ethics,* 73 *N.J.* 123, 128 (1977) (upholding an opinion by the Advisory Committee on Professional Ethics, a committee concerned with attorney ethics, finding it an unethical practice for an attorney to represent a criminal defendant indicted in the county in which the attorney is a freeholder insofar as such practice "can create not only the appearance of impropriety but also a real danger or risk of undue influence."). The Attorney General, conceding that there was no actual impropriety, asserted that a perception may arise that there could be an advantage in having such representation.

But the appearance of impropriety in *Higgins* is real. The prosecutor's office depends for its fiscal resources on the attorney-freeholder. *Ibid.* We have no sense of that here. "[T]he evil sought to be remedied" by the statute, *Oxford Consumer Discount Co. of N. Philadelphia v. Stefanelli,* 102 *N.J.Super.* 549, 565 (App.Div.1968), was any conduct by officials of the executive and legislative branch "which is in violation of their public trust or which creates a justifiable impression among the public that such trust is being violated." *N.J.S. A.* 52:13D–12(a).

Moreover, there is no risk of undue influence or appearance of undue influence posed by a university professor conducting a teaching program whose mission extends to such a State agency. As Governor Cahill emphasized, the statutory section at issue in this appeal, *N.J.S.A.* 52:13D–16, was primarily enacted to meet the ethical issues that arise in connection with the off-hours or "moonlighting" activities of legislators and other State officers and employees who exert undue influence by trading on their prestige or contacts. *See* Remarks of Governor Cahill, *supra,* at 2 ("Members of the Legislature and all State officers and employees must now abide by a comprehensive set of guidelines which delineate just what they are permit-. ted to do and what they are prohibited from doing *in the area of private enterprise.*" (Emphasis added)). This portion of the statute "was designed to regulate the *outside* or *unofficial* conduct of state officers and employees and members of the Legislature in order to avoid activities which create an impression that their public trust is being violated." *De Rose v. Byrne,* 135 *N.J.Super.* 273, 282 (Ch.Div.1975) (emphasis added).

## IV

Nor do the particulars of this case present any special appearance of impropriety or trading on influence. As noted, the case arises from the statutory transfer of the case from the court system to the agency. In June 1986, a staff attorney with the clinic requested an advisory opinion from the Executive Commission on Ethical Standards (Commission) determining whether the professors could continue their representation of the Civic League before the COAH. On January 21, 1987, the Commission ruled that such representation would violate the conflicts law, and recommended that the clinic should seek a legislative change in the law. On February 18, 1987, the Commission refused to stay its ruling pending appeal.

On February 27, 1987, the clinic, on behalf of the Civic League, filed with the Appellate Division a notice of motion for

accelerated review of the administrative determination below and for a stay of that determination pending appeal. On March 27, 1987, the Appellate Division denied the motion. On February 3, 1988, the Appellate Division upheld the Commission's determination, holding that "the Commission correctly determined that the Rutgers' employees in the clinic are subject to the Conflicts Law, and that they cannot represent the League before COAH without violating that law." 222 *N.J.Super.* 482, 501 (1988). We granted certification. 113 *N.J.* 356 (1988).

We are simply unable to agree that in any sense this representation is within the contemplation of the legislative purposes of the conflict of interest law. It is almost a cliche to say that the purpose of courts in statutory construction is to seek to enforce the legislative will. *E.g., AMN, Inc. v. Township of S. Brunswick Rent Leveling Bd.,* 93 *N.J.* 518, 525 (1983); *Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467, 477 *cert. denied,* 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964). We will enforce the legislative will even when the language of the statute is in conflict therewith. *New Jersey Builders, Owners and Managers Ass'n v. Blair,* 60 *N.J.* 330, 338 (1972) ("Where a literal rendering will lead to a result not in accord with the essential purpose and design of the act, the spirit of the law will control the letter."). As we have seen, it has never been the law that for all purposes Rutgers is to be regarded as an alter-ego of the State. *See Fuchilla v. Layman, supra,* 109 *N.J.* 319. It is equally not true that its teaching faculty members are employees of the State for all purposes.

We are not convinced that the faculty handbook cited by our dissenting members, *post* at 231, and the Appellate Division, *supra,* 222 *N.J.Super.* at 492, disposes of the issue. Although the handbook concludes that Rutgers professors are bound by the conflicts law, its interpretation of the law limits its scope to prohibition of appearances before the agency or instrumentality

with which the employee is associated.[2] As such, the handbook's interpretation would not prohibit the representation in this case.

It is difficult to conceive how the well-informed member of the public might conclude that such a person would be able to exert improper influence on the agency. They are not members of the "official family" of State Government (a principle that has always influenced our own decisions with respect to appearances of impropriety), nor do they possess any ability to influence the agency by control of its budget or its personnel in any way. *See Higgins, supra*, 73 *N.J.* at 125 (quoting *Advisory Committee on Professional Ethics Advisory Opinion* No. 291, 97 *N.J.L.J.* 801 (1974)).

The previous rulings of the Executive Commission on Ethical Standards in *Advisory Opinion* No. 4 and *Advisory Opinion* No. 38 do not conflict with our result. The former held that a hearing officer paid by Rutgers should be considered a "state employee" under the Conflicts of Interest Law, but did not indicate what effect this would have. We agree that accepting gifts or favors given in exchange for influence, *N.J.S.A.* 52:13D–14, or post-employment representation on a matter dealt with during State service, *N.J.S.A.* 52:13D–17, would be improper. The latter ruling, No. 38, recognized that Rutgers faculty could represent parties in court even when the State is or might be an adverse party, subject, however, to any specific

---

[2]The handbook states, in relevant part:

[F]aculty and other employees of the University are bound by the New Jersey Conflict of Interest Statute [N.J.S.A. 52:13D–12 *et seq.*]. This statute is quite comprehensive in prohibiting an employee of an agency or instrumentality of the State, among other activities, from accepting bribes; representing or negotiating for, *any party* other than the State *before the agency [or instrumentality] of the State with which he or she is associated;* representing any agency or instrumentality of the State in a transaction with a business in which he or she has a pecuniary interest [except that ownership or control of 10% or less of the stock of a corporation is not deemed to be an "interest" within the meaning of the law].

(Emphasis added; bracketed portions in original.)

conflict that might otherwise be involved. Given the educational purposes of the clinic, and that the State University would be academically and educationally disadvantaged by the contrary interpretation, we hold that a Rutgers University professor in a teaching clinic of this type is not to be regarded as a State employee for purposes of the conflicts-of-interest law.

## V

In so holding, we do no more than resolve the question before us. We draw the line at the outer boundaries of legislative intent. We do not hold that a State university professor who personally seeks or receives fees in the course of legal representation before State agencies of government would or would not be a State employee. There might be circumstances in which an appearance of impropriety would be present. However, for the most part such representation will be by attorneys-at-law, who would be constrained by ethical restrictions on their conduct. *See Higgins, supra,* 73 *N.J.* 123. All that we hold is that the representation here does not evoke any of the concerns that prompted the legislative action.

Nor do we hold that were the Legislature to confirm the holding of the Appellate Division, it would so clearly be an infringement on protected interests that it would be invalid. Nonetheless we are certain that the Legislature would place the highest premium on academic freedom, as it has done invariably in the past, and would carefully balance the State and academic interests in the process. We hold here only that it was undoubtedly not within the contemplation or intent of the Legislature that the phrase, "State employee," under the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–16(b), apply to a university professor supervising a constitutional law clinic when the clinic is occasioned to represent clients whose matters must go before the COAH for resolution of a constitutional claim.

The judgment of the Appellate Division is reversed.

POLLOCK, J., dissenting.

The majority concludes that Rutgers University is not an "instrumentality" of the State and that Rutgers law professors are "not to be regarded as [ ] State employee[s] for purposes of the conflicts-of-interest law." *Ante* at 229. I disagree, and would affirm substantially for the reasons set forth in Judge Petrella's well-reasoned Appellate Division opinion.

Enacted to ensure that the "conduct of public officials and employees shall hold the respect and confidence of the people," *N.J.A.C.* 52:13D–12(a), the Conflicts-of–Interest Law (Conflicts Law or the Law), provides in relevant part:

> No State officer or employee or member of the Legislature * * * shall represent, appear for, or negotiate on behalf of * * * any person or party other than the State in connection with any cause, proceeding, application or other matter pending before any State agency * * *. [*N.J.S.A.* 52:13D–16b.]

Everyone agrees that the Council on Affordable Housing (COAH) is a State agency within the meaning of the statute. Rutgers law professors, therefore, can avoid the characterization as State employees only if they are not so defined in the Conflicts Law.

Under the Conflicts Law, an employee is "any person * * * holding an office or employment in a State agency * * *." *N.J.S.A.* 52:13D–13b. In turn, the Law defines State agency as

> any of the principal departments in the Executive Branch of the State Government, and any division, board, bureau, office, commission or other instrumentality within or created by such department, the Legislature of the State and any office, board, bureau or commission within or created by the Legislative Branch, and, to the extent consistent with law, any interstate agency to which New Jersey is a party and any *independent State authority, commission, instrumentality or agency.* [*N.J.S.A.* 52:13D–13a (emphasis supplied).]

If Rutgers falls within this definition, the Law applies to its employees.

Originally a private college chartered by George III of Great Britain in 1766, Rutgers became "an instrumentality of the state for providing public higher education" in 1945. *L. 1945, c.* 49; *see also Trustees of Rutgers College in N.J. v. Richman,* 41 *N.J.Super.* 259, 264, 272 (Ch.Div.1956) (relating history of

Rutgers from 1766 to 1956). In 1956, Rutgers formally became The State University. *L.* 1956, *c.* 61. Pursuant to "Rutgers, The State University Act of 1956," Rutgers is "the instrumentality of the state for the purpose of operating the State University." *Ibid.* The same provision continues in *N.J.S.A.* 18A:65–2, which is part of "Rutgers, The State University Law," adopted in 1967. These statutes establish Rutgers as an instrumentality of the State. As such, they unequivocally constitute Rutgers as a State agency under the Conflicts Law. It follows, therefore, that Rutgers professors are State employees subject to the law.

When the language of a statute is clear, a court should enforce the statute according to its terms. Judicial interpretation is inappropriate even if a particular application of the law was not foreseen by its drafters. *See, e.g., Sheeran v. Nationwide Mut. Ins. Co.,* 80 *N.J.* 548, 556 (1979). A plain reading of the Conflicts Law mandates its application to Rutgers law professors. The University grasps the point. In the 1986–88 faculty handbook, Rutgers advises that it is an instrumentality of the State and thus its "faculty and other employees * * * are bound by the New Jersey Conflict of Interest Statute." The handbook continues:

> [i]t is the policy of the University that all faculty members avoid any conflict of interest or appearance of conflict of interest, as defined by provisions of the New Jersey Conflicts of Interest Law as well as the relevant Regulations and written policies of the University. * * * This statute is quite comprehensive in prohibiting an employee of an agency or instrumentality of the State, *among other activities,* from * * * representing or negotiating for, any party other than the State before the agency [or instrumentality] of the State with which he or she is associated * * *. [Emphasis added.]

The majority reads the handbook as restricting Rutgers professors from appearing before only "the agency or instrumentality with which the employee is associated." *Ante* at 227. If the majority means that the restriction prevents a professor from appearing only before the University, it makes no sense. The Law bars a State officer or employee from appearing before any State agency, not merely the one that employs the State

officer or employee. Any other reading of the handbook, moreover, ignores the critical clause interpreting the statute to apply to "other activities." In any event, the handbook could not narrow the scope of the Law, which prevents Rutgers professors from appearing "before any state agency."

Until today, neither Rutgers, its faculty, nor the Executive Commission on Ethical Standards had any doubt that the Law applied to Rutgers when they appeared before any State agency. Two Executive Commission opinions prove the point. One opinion holds that a hearing officer appointed to conduct student disciplinary hearings is a State officer subject to the restrictions of the Law. Executive Commission on Ethical Standards, *Opinion No. 4* (Dec. 15, 1972). The second opinion holds that Rutgers professors may appear as expert witnesses in court proceedings. *Advisory Opinion No. 38*, Executive Commission on Ethical Standards. In reaching that result, the Commission analyzed *N.J.S.A.* 52:13D–16b, which precludes a State officer or employee from appearing in any "matter pending before any State agency." The Commission distinguished agency proceedings, as to which State officers and employees were subject to a "broad prohibition" from court proceedings, in which appearances by those officers and employees were unrestricted. Consequently, the professors were permitted to appear as expert witnesses in court proceedings, although they could not have appeared in similar proceedings before a state agency. What has been clear to the Executive Commission on Ethical Standards, the Appellate Division, and Rutgers University is lost on the majority. By exempting Rutgers law professors from the Conflicts Law, this Court strays from its obligation not to engage "in conjecture or surmise which will circumvent the plain meaning" of a statute. *See, e.g., In re Jamesburg High School Closing*, 83 *N.J.* 540, 548 (1980).

The majority correctly observes that the Conflicts Law seeks to prevent the appearance of impropriety, as well as impropriety itself. Because it cannot foresee a situation where the appearance of impropriety would arise, the majority concludes

that the Law does not apply to the Rutgers professors. *Ante* at 225-26. The Commission, however, foresees the possibility that the professors' status as faculty members at a State law school could give the professors an advantage over their adversaries. Given the clarity of the prohibition in *N.J.S.A.* 52:13D-16, I believe the majority should not second-guess the Legislature's implicit determination that Rutgers professors should be subject to the Conflicts Law. *See MacMillen v. Taxation Div. Director*, 180 *N.J.Super.* 175, 177 (App.Div. 1981), *aff'd o.b.*, 89 *N.J.* 216 (1982).

In the Conflicts Law, the Legislature demonstrated that it knew how to exclude from the operation of the Law representation by State employees before State agencies. Thus, *N.J.S.A.* 52:13D-16c allows State employees to appear before agencies as diverse as the Division on Civil Rights, the Workers' Compensation Bureau, the Transfer Inheritance Tax Bureau, the New Jersey Public Employment Relations Commission, and the Unsatisfied Claim and Judgment Fund Board. If the Legislature had wanted to remove Rutgers law professors from the Conflicts Law, it could have provided them with a similar exemption. *Cf. N.J.S.A.* 52:27E-29 (granting Public Advocate right to represent the public interest in administrative proceedings).

Exempting the professors from the Conflicts Law is a matter for the Legislature, not the judiciary. In this regard, I am troubled by appellants' argument concerning the relationship between the legislative and judicial branches of government. When asked at oral argument why appellants had not sought a legislative amendment to the Conflicts Law, its counsel replied:

> Some overtures have been made to the Legislature about making legislative change, I'm aware of that. But I think we're all, all have enough practical experience, sort of politically sophisticated enough, to understand the vicissitudes of the legislative process.
>
> * * * * * * * *
>
> I think we can generally agree that moving any kind of a bill through the Legislature is like trying to push a rock up a hill. * * * I mean you know, if

you want to get a particular piece of legislation through you have to find a sponsor.

\* \* \* \* \* \* \* \*

Well, it's not just a sponsor. You gotta go through committee, you gotta get it posted in both houses, you got to line up forty-one votes in the Assembly, twenty-one in the Senate.

When directly asked whether the reason appellants were proceeding before the judiciary, rather than the Legislature, because that course would be easier, appellants' counsel responded: "I think it probably is." Although the wall between the Legislature and the judiciary is not insurmountable, it ought not to be so easily scaled. More is at stake than an easy answer.

Much commends the encouragement of clinical education and the appearance of Rutgers law professors before State agencies pursuant to that program. Clinical programs bridge the gap between the classroom and the world of the practitioner. They help law students to develop the skills needed to relate to witnesses, clients, attorneys, judges, and the public. This case, however, is not a referendum on clinical education. As attractive as are clinical programs, I cannot ignore the Conflicts Law as drafted. *See Knight v. Margate*, 86 *N.J.* 374, 391 (1981). Furthermore, enforcement of the Conflicts Law as written need not deprive Rutgers students of clinical programs. As the Appellate Division pointed out, the students could be accompanied by lawyers who are not members of the Rutgers faculty when appearing before COAH and other agencies not excluded from the Conflicts Law. 222 *N.J.Super.* at 492–93.

Ethical conduct in government requires constant vigilance. The Conflicts Law itself was adopted only after careful deliberation and soul-searching by the Legislature. In this case, the Executive Commission on Ethical Standards has concluded that the Conflicts Law applies to appellants. That decision is entitled to judicial deference. *See Newark Firemen's Mut. Benevolent Ass'n v. Newark*, 90 *N.J.* 44, 55 (1982). By overriding the decision of the agency to which enforcement of the Law is

entrusted, the majority undermines the effectiveness of the Commission and unnecessarily encourages appeals from every disgruntled employee whose conduct violates the Conflicts Law. I would leave the granting of exemptions to the Legislature and the agency to which it has delegated the enforcement of the Law.

I would affirm.

*For Affirmance*—Justices CLIFFORD, POLLOCK and STEIN—3.

*For Reversal*—Chief Justice WILENTZ and Justices HANDLER, O'HERN and GARIBALDI—4.