6 A.3d 983

SUSSEX COMMONS ASSOCIATES, LLC, A LIMITED LIABILITY COMPANY OF THE STATE OF NEW JERSEY, AND HOWARD BUERKLE, PLAINTIFFS–APPELLANTS, v. RUTGERS, THE STATE UNIVERSITY; RUTGERS ENVIRONMENTAL LAW CLINIC; AND RUTGERS UNIVERSITY CUSTODIAN OF RECORDS, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 13, 2010—Decided October 25, 2010.

538

Before Judges FUENTES, GILROY and SIMONELLI.

*Kevin D. Kelly* argued the cause for appellants (*Kelly & Ward,* attorneys; *Mr. Kelly,* on the brief).

*James P. Lidon* argued the cause for respondents (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *John J. Peirano, Jr.,* of counsel and on the brief; *Mr. Lidon,* on the brief).

*John J. Farmer, Jr.,* argued the cause for Rutgers Constitutional Litigation Clinic, attorneys for amicus curiae Rutgers Law School/Newark Clinical Programs (*Frank Askin, Jon Dubin,* and *Steve Gold,* on the brief).

*Eastern Environmental Law Center,* attorneys for amici curiae Citizens for Responsible Development at Ross' Corner, Coalition to Protect Our Land, Lakes and Watersheds, and Weissman & Mintz, (*Julia A. LeMense* and *Richard Webster,* on the brief).

*Day Pitney,* attorneys for amici curiae CPG Holdings, Holdings, L.L.C., and CPG Partners, L.P. (*John C. Maloney, Jr.,* on the brief).

*Edward Lloyd,* attorney for amici curiae Clinical Legal Education Association, Society of American Law Teachers, and American Association of University Professors.

*Robert F. Williams,* attorney for amicus curiae Association of American Law Schools.

The opinion of the court was delivered by

FUENTES, J.A.D.

Plaintiffs Sussex Commons Associates, LLC, and Howard Buerkle filed a formal request under the Open Public Records Act

("OPRA"), *N.J.S.A.* 47:1A–1 to –13, with the Custodian of Records for Rutgers, the State University, seeking access to eighteen categories of documents concerning the Environmental Law Clinic (Clinic) operated by Rutgers Law School in Newark. The request sought documents related to the Clinic's finances and its representation of two private citizens' groups that were opposing plaintiffs' proposed development of an outlet mall.

The Custodian denied plaintiffs' request because, in her view, the request was "open-ended" and did not identify what particular documents plaintiffs sought to inspect or copy. Instead of narrowing the request or identifying the specific documents they sought to inspect and copy, plaintiffs filed an action in lieu of prerogative writs in the Law Division seeking relief under both OPRA and our State's common law right of access. Plaintiffs named as defendants Rutgers, the State University, the Clinic, and the Custodian of Records for Rutgers University.

After the Law Division granted defendants' motion to transfer venue from Sussex County to Middlesex County, the parties conducted discovery under a court-ordered schedule during which the Custodian submitted a supplemental response to plaintiffs' initial OPRA request. On the return date of the order to show cause, the court ruled that the Environmental Law Clinic was not subject to OPRA and dismissed plaintiffs' complaint. The court did not address plaintiffs' claims under the common law right of access.

Plaintiffs now appeal, arguing that the trial court erred in denying their request for these records pursuant to both OPRA and the common law right of access. Defendants and amici curiae urge us to uphold the ruling of the trial court. After reviewing the record developed by the parties, we reverse the trial court's ruling exempting the Clinic from the provisions of OPRA and remand for the trial court to determine whether the specific documents requested by plaintiffs are exempt from disclosure under the definition of "government record" in *N.J.S.A.* 47:1A–1.1. To the extent that OPRA may not provide complete relief, the

trial court shall also review and decide plaintiffs' requests under our State's common law right of access.

The following facts will inform our discussion of the issues raised by the parties.

I

The Clinic at Rutgers Law School (Law School) in Newark has been in existence since 1985. The Clinic provides pro bono environmental legal services to the public and offers the students attending the Law School a unique and challenging didactic experience: the opportunity to work on real cases under the supervision of their professors, thereby creating a "hands-on" legal experience while providing under-represented clients with competent legal assistance.

The Clinic is one of eight clinical programs affiliated with the Law School. They share office space and have dedicated computer systems that are physically separate from the Law School and the University. As part of the Law School, public funds underwrite a portion of the operating expenses of the Clinic.[1]

Beginning in 2004, the Clinic represented two related non-profit citizens' groups, the Coalition to Protect Our Land, Lakes and Watersheds (Coalition) and the Citizens for Responsible Development at Ross' Corner (CRDRC). These organizations challenged an application by plaintiff Sussex Commons to build a ninety-store outlet mall in Frankford Township (Township). Acting as the legal representative of these two non-profit groups, the Clinic presented evidence in opposition to plaintiff's application at all permit and development hearings, intervened and filed cross-claims in at least two lawsuits between Sussex Commons and the Township, and directly appealed the Township's development approvals.

---

[1] A portion of the Clinic's operational expenses are paid through court-awarded fees in cases prosecuted pursuant to fee-shifting statutes.

Despite this opposition, Sussex Commons succeeded in obtaining subdivision and site plan approvals for the outlet mall development. Thereafter, Sussex Commons filed suit against one of its competitors, Chelsea Property Group ("CPG"), alleging tortious interference with prospective business advantage, unfair competition, and prima facie tort stemming from the defendant's alleged attempts to impede the development of Sussex Commons. During the proceedings in that litigation, Sussex Commons discovered that CPG had given $16,500 to the Coalition and the CRDRC to pay for a traffic study opposing the outlet mall development project. In light of this evidence, Sussex Commons moved to add the Coalition and the CRDRC as co-conspirator defendants in the tortious interference suit. The judge presiding over the case denied the motion, finding the groups' opposition to the development was a protected activity under the First Amendment.

The denial of this motion did not deter Sussex Commons in its efforts to obtain more information concerning the groups' activities. Specifically, in an attempt to show that CPG had conspired with the Clinic, the citizens' groups, and Township officials to thwart its development plans, Sussex Commons sought to compel discovery of communications between CPG's counsel (Pitney Hardin, now Day Pitney) and the Clinic. The judge presiding over the litigation denied Sussex Commons' application, holding that the communications were protected under the attorney-client privilege as "work product and attorney materials." The judge gave the following explanation in support of his ruling:

> Even if Sussex is entitled to know if [CPG]'s attorneys are lending aid or assistance to the Law Clinic, which the Court believes they are, Sussex [Commons] is not entitled to the substance of those communications. That would totally undermine attorney-client privileges and work product exceptions. What Sussex [Commons] is seeking here is much too broad.
>
> Can they ask [CPG] reps if they are assisting the Environmental Law Clinic and CRDRC? I believe that they can. Can they see those communications? I don't believe that they're entitled at this juncture based upon the information that they're providing.
>
> It's in great part a fishing expedition.

. . . .

So other than the disclosure that the assistance is being rendered, the actual substance of the aid is protected unless there is a suggestion, more than a suggestion that [the Clinic] is acting improperly. And I don't believe, as has been suggested today, that they are acting improperly. They were totally within their legal bounds in pressing their point of view before these various governmental agencies.

The fact that Pitney Hardin actually gave legal assistance to [the Clinic] is relevant. It shows the intent that [Sussex Commons] is trying to show, but again, they can't go beyond that and get the individual documents that are being sought.

Plaintiff's tortious interference complaint was ultimately dismissed in 2008. On plaintiff's appeal, we affirmed the trial court's order of dismissal. *Sussex Commons Outlets, LLC v. Chelsea Prop. Group, Inc.*, No. A–3714–07T1, 2010 *WL* 3772543 (App.Div. Sept. 23, 2010) (slip op. at 2).

In May 2006, plaintiffs submitted a formal request to the University's Custodian of Records seeking access to eighteen categories of information that plaintiffs believed could demonstrate financial or other ties between CPG, the Clinic, the CRDRC, and Township officials. This request encompassed documents showing how the Clinic was funded, records of time and funds spent on opposing the outlet mall, staff meeting minutes, communications with the CRDRC before the Clinic's representation, and any documents received from CPG or its counsel in Sussex Commons' tortious interference case. Specifically, plaintiffs requested:

1) Documents reflecting the allocation of funds by Rutgers University to Rutgers Environmental Law Clinic for 2003, 2004, 2005 and 2006.

2) Copies of all bills to Citizens for Responsible Development at Ross' Corner from Rutgers Environmental Law Clinic.

3) Documents containing the time records and time spent for all attorneys, paralegals and secretaries of the Rutgers Environmental Law Clinic on behalf of Citizens for Responsible Development at Ross' Corner in connection with the Sussex Commons project at Ross' Corner.

4) Documents containing all disbursements on behalf of Citizens for Responsible Development at Ross' Corner in connection with the Sussex Commons project at Ross' Corner.

5) Documents containing all payments to expert witnesses on behalf of Citizens for Responsible Development at Ross' Corner in connection with the Sussex Commons project at Ross' Corner.

6) Documents containing payments made by Citizens for Responsible Development at Ross' Corner to Rutgers Environmental Law Clinic.

7) Minutes of Board and Staff meetings at which the Sussex Commons application was discussed.

8) All documents and submissions to Rutgers University and Rutgers Environmental Law Clinic by Paul Sutphen, Robert McDowell, David Mintz, Citizens for Responsible Development at Ross' Corner and Allyn Jones,[2] prior to Rutgers Environmental Law Clinic's decision to represent Citizens for Responsible Development at Ross' Corner.

9) All documents received by the Rutgers Environmental Law Clinic from Robert McDowell.[3]

10) All documents received by the Rutgers Environmental Law Clinic from David Mintz.

11) All documents received by the Rutgers Environmental Law Clinic from Schoor DePalma.[4]

12) All documents received by Rutgers Environmental Law Clinic from Chelsea Property Group, Inc.

13) All documents received by Rutgers Environmental Law Clinic from Pitney Hardin, LLP.

14) All documents received by Rutgers Environmental Law Clinic from Frankford Township.

15) All documents between any State agency/Sussex County agency and Rutgers Environmental Law Clinic.

16) All documents between any Sussex County agency and Rutgers Environmental Law Clinic.

17) All documents received by the Rutgers Environmental Law Clinic from any Frankford Township Land Use Board member.

18) All documents received by the Rutgers Environmental Law Clinic from any professional and/or representative of Frankford Township and/or its Land Use Board.

By letter dated May 2006, the Custodian denied plaintiffs' request. Citing *MAG Entertainment, LLC v. Division of Alcoholic Beverage Control,* 375 *N.J.Super.* 534, 549, 868 *A.*2d 1067

---

[2] Paul Sutphen, David Mintz, and Allyn Jones are officers of the Coalition; Sutphen and Jones formed the CRDRC.

[3] Robert McDowell was at the time on the Frankford Township Committee and a member of the municipal Board of Adjustment.

[4] Schoor DePalma was the engineering company retained by the CRDRC as its traffic expert.

(App.Div.2005), the Custodian indicated that those seeking the disclosure of information under OPRA must clearly identify the documents sought, as opposed to asking for all documents in a particular category. Despite this, in November 2005, the Custodian sent plaintiffs copies of the Clinic's billings to the CRDRC, which corresponded to Category 2 of plaintiffs' request and consisted "solely" of bills "for out-of-pocket costs incurred by the Clinic in connection [with] its representation of [the] CRDRC." Indeed, in their appellate briefs plaintiffs concede that they have received "complete responses" from the Custodian as to Categories 2, 4, and 6 of their May 2006 OPRA request.

In a certification dated October 17, 2006, opposing plaintiffs' order to show cause, Clinic Staff attorney Julia LeMense Huff addressed the remaining categories. LeMense Huff indicated that most of the documents requested by plaintiffs "do not exist," were privileged, or would require extensive searches of existing materials to identify. In her sixteen-page certification, containing seventy-six individually enumerated paragraphs, LeMense Huff addressed each category identified by plaintiffs.

As to category 1 (seeking documents reflecting the allocation of funds by the University to the Clinic for 2003–2006), LeMense Huff indicated that "to the best of [her] knowledge, the University [was] searching for responsive documents and [would] produce same." As to categories 3, 5, and 7, LeMense Huff certified that "the requested documents do not exist," since the Clinic has never (1) made or kept time records of its representation of the CRDRC, (2) made payments to expert witnesses on behalf of the CRDRC, or (3) had a Board or created minutes of its staff meetings.

By letter dated March 10, 2008, the Custodian provided the following supplemental response to plaintiffs' OPRA request:

The University has conducted additional inquiries into Plaintiff[s'] OPRA Request [i.e., Category] No. 1, which seeks documents reflecting the allocation of funds by the University of Rutgers Environmental Law Clinic for 2003–2006.

Those inquiries disclosed no documents describing or reflecting such an allocation. Although not required by OPRA, the University has authorized us to inform you that the sole funding allocated by the University to the [Clinic] during the period in

question has been for the salary of the person holding the position of Director or Acting Director of the Clinic. The salary funding was as follows:

| | | |
|---|---|---|
| 2002-2003 Academic Year | $75,016 |
| 2003-2004 Academic Year | 84,140 |
| 2004-2005 Academic Year | 82,804.99 |
| 2005-2006 Academic Year | 76,641.43 |

Funding for other clinic faculty and staff was provided via restricted grants.

Plaintiffs' counsel responded to the Custodian in a letter dated June 10, 2008, through which he attempted to clarify his earlier request. In this correspondence counsel requested Clinic documents: (1) pertaining to its employees between 2002 and 2006; (2) documents showing payments, funding, or "in kind assistance" by the University; (3) records of contributions or restricted grants donated between 2002 and 2006; and (4) the names of any donors.

The following day plaintiffs filed another formal request with the Custodian for access to documents showing the Clinic's operations, structure, employees, donations received, its relationship to the University, records showing all student participation in matters involving the proposed outlet mall, and copies of any previous OPRA requests submitted to any of the University's clinics.

In a letter dated June 30, 2008, the Custodian informed plaintiffs that documents pertaining to the Clinic's organizational structure did not exist and requested additional time to "work on the remainder of your request." In early July 2008, the Custodian again explained that some of the requested documents did not exist and that a fee would be required to search for many of the others. The Custodian reiterated that the Clinic did not have a certificate of incorporation, by-laws, board of directors, bank accounts, or operating agreement with the University. The Custodian and plaintiffs' counsel continued to exchange letters and emails in an effort to clarify each other's position.

On July 21, 2008, plaintiffs filed a motion to supplement the record with these latest requests made and the Custodian's responses thereto and sought additional discovery to pursue the matter. On August 4, 2008, the trial court issued a bench decision holding "that because of [their] unique situation as a hybrid

institution, an academic institution, and a law firm which represents clients, Rutgers Law School Clinics are exempt from OPRA requests."

## II

The trial court began its analysis by confronting the principal issue raised by the parties: is the Clinic subject to OPRA? In addressing this question, the court acknowledged that both the University and the Law School are subject to OPRA. This determination is not disputed by either of these two defendants. The court also found that, by virtue of their funding and support, the clinics are subdivisions of the Law School. In reaching this conclusion, the court relied on *Right to Choose v. Byrne*, 173 *N.J.Super.* 66, 413 *A.*2d 366 (Ch.Div.1980), *rev'd on other grounds*, 91 *N.J.* 287, 450 *A.*2d 925 (1982), in which the Chancery Division found that

Rutgers Law School and its Woman's Rights Litigation Clinic are subdivisions of the State, not separate entities as are legal services corporations. Law school expenditures are pursuant to and limited by legislative appropriations in accordance with the State Constitution, Art. VIII, § II, par. 2. The law school in turn allocates funds to the clinic.

[*Id.* at 72, 413 *A.*2d 366.]

Despite this finding, the trial court held that the Clinic is not subject to OPRA. Relying on *In re Determination of Executive Commission on Ethical Standards*, 116 *N.J.* 216, 218, 561 *A.*2d 542 (1989) (in which the Court exempted clinical professors from our State's Conflict of Interest Law, *N.J.S.A.* 52:13D–12 to –28, by permitting them to appear on behalf of clients before state administrative agencies) and *Brown v. Newark*, 202 *N.J.Super.* 1, 10, 493 *A.*2d 1255 (App.Div.1985), *aff'd in part and rev'd in part on other grounds*, 113 *N.J.* 565, 552 *A.*2d 125 (1989) (in which we found "no impediment to the award of an attorney's fee under 42 *U.S.C.A.* § 1988 to the Rutgers Urban Legal Clinic, *an arm of the State*" (emphasis added)), the trial court concluded that the Clinic is vested with a "unique hybrid nature" as a state subdivision, an

academic institution, and a "practicing legal entity which represents clients."

Adopting the arguments advanced by defendants, the court further found that subjecting the Clinic to the disclosure provisions of OPRA would put them in a distinct disadvantage as compared with private law school clinics and private law firms. According to the court, potential clients would be hesitant to seek the services of the Law School's clinics if their case files could be subject to non-discovery disclosure.

In addition to the concerns identified by the trial court, defendants argue that subjecting the Law School's clinics to the provisions of OPRA would infringe upon the clinics' mandate of academic freedom. Amicus curiae Rutgers Law School/Newark Clinical Programs notes that OPRA's provisions would not exempt many records produced in the course of the Clinic's primary mission to educate law students, such as requests for legal assistance, student and faculty reflections and interactions, and internal discussions of legal and academic policy when clients are not involved. Thus, it urges us to create a specific "categorical exclusion" for law clinics in the definition of "state agencies" in OPRA.

Amici curiae Clinical Legal Education Association, Society of American Law Teachers, and American Association of University Professors support the argument that the Clinic is entitled to academic freedom. They predict that record requests will become adversarial tools aimed at clinical law offices, undermining the practice of law within those clinics. Thus, requiring the Clinic to grant access to those documents will infringe on the First Amendment rights of clinic clients to be free from intrusive inquiries into their operations.

### III

We review de novo "the issue of whether access to public records under OPRA and the manner of its effectuation are warranted." *MAG Entm't, LLC, supra,* 375 *N.J.Super.* at 543,

868 *A.*2d 1067. Indeed, a trial court's legal conclusions are always subject to de novo review. *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

■ Before we start our analysis, it is helpful to identify what issues are not in dispute. The University is a publicly funded state institution and includes the Law School. *See* "Rutgers, the state university law" ("Rutgers Law"), *N.J.S.A.* 18A:65–1 to –93. In 1946, the Law School was "incorporated into and designated as a part of the [University]." *L.* 1946, *c.* 217. The University itself is subject to OPRA's requirements. *See Keddie v. Rutgers, The State University*, 148 *N.J.* 36, 43, 689 *A.*2d 702 (1997), (acknowledging the University as subject to OPRA's predecessor, the Right-to-Know Law, *N.J.S.A.* 47:1A–1 to –4).

It is uncontested that the Clinic is affiliated with and is part of the Law School. *Brown, supra,* 202 *N.J.Super.* at 10, 493 *A.*2d 1255; *Right to Choose, supra,* 173 *N.J.Super.* at 72, 413 *A.*2d 366. Indeed, *N.J.S.A.* 18A:65–3 makes all "departments, colleges, schools, centers, branches, educational and other units and extensions thereof" a part of the University.

■ The provisions of OPRA apply to the Clinic because it meets the definition of a public agency:

"Public agency" or "agency" means any of the principal departments in the Executive Branch of State Government, and any division, board, bureau, office, commission or *other instrumentality within or created by such department;* the Legislature of the State and any office, board, bureau or commission within or created by the Legislative Branch; and any independent State authority, commission, instrumentality or agency. The terms also mean any political subdivision of the State or combination of political subdivisions, and any division, board, bureau, office, commission or other instrumentality within or created by a political subdivision of the State or combination of political subdivisions, and any independent authority, commission, instrumentality or agency created by a political subdivision or combination of political subdivisions.

[*N.J.S.A.* 47:1A–1.1 (emphasis added).]

Our conclusion that the Clinic is subject to OPRA is also supported by *Times of Trenton Publishing Corp. v. Lafayette Yard Community Development Corp.,* 183 *N.J.* 519, 534–36, 874 *A.*2d 1064 (2005), in which the Court held that a private, non-profit

corporation "created by a political subdivision of the State" was a "public agency" subject to OPRA, as defined in *N.J.S.A.* 47:1A–1.1. As Chief Justice Poritz explained on behalf of a unanimous Court:

> Suffice it to say that the Mayor and City Council have absolute control over the membership of the Board of Lafayette Yard and that the Corporation could only have been "created" with their approval. That the conditions under which Lafayette Yard operates are dictated by [an] IRS Revenue Ruling ... is beside the point; the effect is that Lafayette Yard is subject to the requirements of OPRA.
>
> [*Id.* at 535–36, 874 *A.*2d 1064.]

Similarly here, the Clinic was created and is funded in part by the Law School. Clinic attorneys are hired as part of the faculty of the Law School and are retained or discharged by the Law School. Despite its hybrid status as recognized by the courts in fee-shifting cases, the Clinic operates as an integral part of the Law School's academic mission. For purposes of OPRA, the Clinic is indistinguishable from any other academic program offered by the Law School.

Our conclusion in this respect is consistent with and promotes the strong public policy the Legislature adopted in passing OPRA. OPRA strikes a proper balance because it favors disclosure of public information while directing a public agency to safeguard the confidentiality of "citizen[s'] personal information with which it has been entrusted when disclosure thereof would violate the citizen[s'] reasonable expectation of privacy." *N.J.S.A.* 47:1A–1. Any fear that personal information given by litigants to Clinic attorneys, staff, or students in the course of their representation will be subject to disclosure under OPRA is unfounded. Documents that meet the definition of government record, and therefore may be subject to public disclosure, may be nevertheless shielded from public scrutiny if the public interest in favor of confidentiality outweighs the private right of access. *Burnett v. County of Bergen*, 198 *N.J.* 408, 422, 968 *A.*2d 1151 (2009); *In re Readoption with Amendments of Death Penalty Regulations*, 367 *N.J.Super.* 61, 74, 842 *A.*2d 207 (App.Div.2004).

In rejecting a categorical exemption from OPRA for this Clinic and for legal clinical programs in public law schools in general, we are also mindful that the Legislature carefully delineated a series of exemptions to disclosure under the definition of "government record," including the following six exemptions specifically addressed to institutions of higher education:

A government record shall not include, with regard to any public institution of higher education, the following information which is deemed to be privileged and confidential:

pedagogical, scholarly and/or academic research records and/or the specific details of any research project conducted under the auspices of a public higher education institution in New Jersey, including, but not limited to research, development information, testing procedures, or information regarding test participants, related to the development or testing of any pharmaceutical or pharmaceutical delivery system, except that a custodian may not deny inspection of a government record or part thereof that gives the name, title, expenditures, source and amounts of funding and date when the final project summary of any research will be available;

test questions, scoring keys and other examination data pertaining to the administration of an examination for employment or academic examination;

records of pursuit of charitable contributions or records containing the identity of a donor of a gift if the donor requires non-disclosure of the donor's identity as a condition of making the gift provided that the donor has not received any benefits of or from the institution of higher education in connection with such gift other than a request for memorialization or dedication;

valuable or rare collections of books and/or documents obtained by gift, grant, bequest or devise conditioned upon limited public access;

information contained on individual admission applications; and

information concerning student records or grievance or disciplinary proceedings against a student to the extent disclosure would reveal the identity of the student.

[*N.J.S.A.* 47:1A–1.1]

OPRA also includes a deliberative-process exemption, protecting from disclosure a record that contains or involves factual components when the record is used in the public agency's decision-making process and its disclosure would reveal deliberations that occurred during that process. *Educ. Law Ctr. v. New Jersey Dep't of Educ.*, 198 *N.J.* 274, 299, 966 *A.*2d 1054 (2009). The deliberative-process exemption requires a fact-sensitive analysis to determine whether "the information sought is a part of the process leading to formulation of an agency's decision ... and,

second, on the material's ability to reflect or to expose the deliberative aspects of that process." *Id.* at 295, 966 *A.*2d 1054.

*N.J.S.A.* 47:1A–1.1 also protects from public disclosure "any record within the attorney-client privilege." This attorney-client privilege does not include, however, "attorney or consultant bills or invoices," provided that they "may be redacted to remove any information protected by the attorney-client privilege." *Ibid.*

These exemptions to OPRA's public disclosure provisions rebut the arguments raised by defendants that unless we craft a judicial categorical exemption for legal clinics, OPRA would be used to indiscriminately access clinical records by those seeking to gain some kind of adversarial advantage.

Defendants argue, however, that even if the bulk of the Clinic's operations and activities are protected from public disclosure under OPRA, a judicially crafted blanket exemption is still needed to avoid a case-by-case defense of potentially numerous fact-sensitive applications. According to defendants, if the Clinic or the University is compelled to defend each of these OPRA requests, it would needlessly consume limited resources and divert the Clinic from its core mission of providing legal assistance to underserved clients in critically important areas of law. Moreover, this burden is not shared by clinics in private law schools or by private law firms. Thus, defendants argue, "[t]he fact that there is State involvement in education should never be a disadvantage." *In re Determination of Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 223, 561 *A.*2d 542.

We reject this argument on three grounds. First, any alleged disadvantage resulting from the Clinic's association with the University and its Law School is offset by the advantage the Clinic receives in the form of public funding. With the acceptance of public funds comes the accountability and transparency that all publicly financed institutions must endure. Given the provisions in OPRA affording broad protections to institutions of higher education, the protection afforded to attorney-client communications and to a public agency's deliberative-process, and the confi-

dentiality protections embodied in *N.J.S.A.* 47:1A–1, any potential disadvantage resulting from the Clinic's association with this University is a reasonable burden to bear to advance a policy of accountability and transparency.

Second, the kind of blanket exemption from the disclosure provisions in OPRA sought by defendants here is illusory because even if we were to declare that the Clinic is not subject to OPRA, plaintiffs and others like them would still be entitled to bring an action seeking disclosure under our common law right of access. As we noted in *Bergen County Improvement Authority v. North Jersey Media Group, Inc.*, 370 *N.J.Super.* 504, 851 *A.*2d 731 (App.Div.2004), *certif. denied*, 182 *N.J.* 143, 861 *A.*2d 847 (2004):

> In adopting OPRA, the Legislature expressly and unambiguously declared that the common law right of access remained a viable and legally independent means for a citizen to obtain public information.
>
> [*Id.* at 516, 851 *A.*2d 731.]

■ Our holding in *Bergen County Improvement Authority* was cited approvingly in *Mason v. City of Hoboken*, 196 *N.J.* 51, 67, 951 *A.*2d 1017 (2008), in which the Supreme Court stated that "[t]he common law definition of a public record is broader than the definition [of government record] contained in OPRA." Thus, it is now settled that nothing contained in OPRA can be construed "as affecting in any way the common law right of access." *N.J.S.A.* 47:1A–1; *N.J.S.A.* 47:1A–8.

Third, in adopting OPRA, the Legislature specifically delineated twenty-one exemptions from the definition of "government record" in *N.J.S.A.* 47:1A–1. The decision to exempt certain categories of documents is an expression of public policy by the Legislature that we are bound to respect and enforce. *See Educ. Law Ctr., supra,* 198 *N.J.* at 284, 966 *A.*2d 1054. Even if we were to share defendants' public policy concerns about the need to exempt law school clinics from the definition of "government record" under *N.J.S.A.* 47:1A–1, it is not our role to amend this statute by judicial fiat and add a twenty-second exemption category. We recently reaffirmed:

OPRA ... represents this state's longstanding public policy favoring ready access to most public records. As such, the court must always maintain a sharp focus on the purpose of OPRA and resist attempts to limit its scope, absent a clear showing that one of its exemptions or exceptions incorporated in the statute by reference is applicable to the requested disclosure.

[*Tractenberg v. Twp. of West Orange*, 416 *N.J.Super.* 354, 378–79, 4 *A.*3d 585 (App.Div.2010) (citations omitted) (internal quotation marks omitted) ].

## IV

With these legal principles in mind, we now return to plaintiffs' application. Based on our review of the record, plaintiffs have limited their appeal to those documents listed in categories 1, 3, 5, and 7 of their initial OPRA request. We thus reverse the trial court's ruling exempting the Clinic from the provisions of OPRA and remand for the court to address plaintiffs' requests by applying the provisions in OPRA as discussed herein.

We note, however, that plaintiffs predicated their requests under both OPRA and the common law right of access. Inexplicably, the trial court's ruling only addressed plaintiffs' application under OPRA. Thus, in addition to considering plaintiffs' requests under the provisions of OPRA, the court shall also apply the legal principles articulated by the Supreme Court in *Keddie v. Rutgers, supra,* and its progeny to determine whether plaintiffs are entitled to any relief under the common law right of access.

Reversed and remanded. We do not retain jurisdiction.