46 A.3d 536

SUSSEX COMMONS ASSOCIATES, LLC, A LIMITED LIABILITY COMPANY OF THE STATE OF NEW JERSEY, AND HOWARD BUERKLE, PLAINTIFFS–RESPONDENTS, v. RUTGERS, THE STATE UNIVERSITY; RUTGERS ENVIRONMENTAL LAW CLINIC; AND RUTGERS UNIVERSITY CUSTODIAN OF RECORDS, DEFENDANTS–APPELLANTS.

Argued March 12, 2012—Decided July 5, 2012.

532

*James P. Lidon* argued the cause for appellants (*McElroy, Deutsch, Mulvaney & Carpenter,* attorneys; *John J. Peirano,* of counsel; *Mr. Lidon, Mr. Peirano,* and *David M. Alberts,* on the briefs).

*Kevin D. Kelly* argued the cause for respondents (*Kelly & Ward,* attorneys).

*John J. Farmer, Jr.,* argued the cause for amici curiae Rutgers School of Law, Newark and Camden Clinical Programs (*Frank Askin,* Director, Rutgers Constitutional Litigation Clinic, attorney, *John C. Lore, III,* of counsel; *Mr. Farmer, Mr. Askin, Jon C. Dubin,* and *Ronald K. Chen,* on the brief).

*Edward L. Lloyd* submitted a brief on behalf of amici curiae Clinical Legal Education Association, Society of American Law Teachers & American Association of University Professors.

*Robert F. Williams* submitted a brief on behalf of amicus curiae Association of American Law Schools (*Rutgers School of Law, Camden,* attorney).

Chief Justice RABNER delivered the opinion of the Court.

The question raised in this appeal is whether records of a legal clinic at a public law school are subject to the Open Public Records Act (OPRA). The Rutgers Environmental Litigation Clinic (RELC or the Clinic) represented a private group that opposed a plan to build an outlet mall. The mall's developer, Sussex Commons Associates, LLC (Sussex Commons or Sussex), sought documents from its adversary—the Clinic—under OPRA. The trial court concluded that the Clinic was exempt from OPRA requests, and the Appellate Division reversed.

We now reverse the judgment of the Appellate Division and hold that records related to cases at public law school clinics are not subject to OPRA. We find no evidence that the Legislature intended to apply OPRA to teaching clinics that represent private clients, or that it meant to cause harm to clinical programs at public law schools when it enacted OPRA. We also conclude that the common law right of access does not extend to case-related records of law school clinics.

## I.

The RELC is one of eight clinical legal education programs at Rutgers Law School–Newark. The Clinic has been in existence since 1985 and provides pro bono legal assistance to clients on environmental matters.

The RELC and the other Rutgers legal clinics operate like a law firm in office space that is accessible only to the clinics. The clinics also serve an important educational function by preparing law students for the actual practice of law. Students who participate in the clinics have an opportunity to perform "hands-on" legal work on actual cases.

In 1996, the American Bar Association began to require that accredited law schools offer such programs. Robert R. Kuehn & Peter A. Joy, *An Ethics Critique of Interference in Law School Clinics*, 71 Fordham L.Rev.1971, 1972 (2003); ABA Standards for

Approval of Law Schools 302(b)(1) (2011–12), *available at* http://www.americanbar.org/groups/legal_education/resources/standards.html. Today, clinical legal programs are an accepted part of legal education. At clinics across the country, law students provide an estimated more than two million hours of legal work each year to clients who lack the resources to hire an attorney. Ctr. for the Study of Applied Legal Educ., *Report on the 2007–2008 Survey* 19 (2008), http://csale.org/files/CSALE.07–08.Survey.Report.pdf. In support of that practice, New Jersey court rules permit third-year law students and recent graduates who are not yet admitted to the bar to appear in court and practice law as part of an approved clinical program. *R.* 1:21–3(b).

Starting in 2004, the RELC began representing two clients: (1) the Coalition to Protect Our Land, Lakes and Watersheds (Coalition), a non-profit corporation dedicated to preserving and protecting lands and watersheds in northwest New Jersey; and (2) the Citizens for Responsible Development at Ross' Corner (CRDRC), another non-profit corporation that opposed Sussex Commons' plan to develop a ninety-store outlet mall at Ross' Corner in Frankford Township. David Mintz, Allyn Jones, and Paul Sutphen were officers of the Coalition; Paul Sutphen, Geri Sutphen, and Allyn Jones were CRDRC's original officers.

Sussex Commons and a closely related entity filed several lawsuits in connection with the development of the mall. Of particular relevance is a lawsuit Sussex Commons brought against the Chelsea Property Group. Sussex alleged that Chelsea tortiously interfered with Sussex Commons' attempts to secure tenants for the proposed mall.

In November 2005, Sussex Commons moved to amend its complaint against Chelsea to name Mintz, Jones, Paul Sutphen, and Robert McDowell as co-conspirators but not defendants. (McDowell was a member of the Frankford Township Committee and the Frankford Township Land Use Board.) Sussex also sought broader discovery of the four individuals. The trial court denied the motion to amend and found that Sussex Commons was

using the threat of legal action to chill the exercise of First Amendment rights by citizens opposed to the outlet mall.

Sussex Commons attempted to get information about the alleged conspiracy in other ways as well. As part of the lawsuit against Chelsea, Sussex sought to discover communications between Chelsea's counsel—the law firm then known as Pitney Hardin—and the RELC. In its ruling on June 23, 2006, the trial court observed that Sussex was entitled to know if Chelsea's attorneys were assisting the RELC but refused to order disclosure of the substance of any communications between them. Those communications, the court explained, were protected by attorney-client and work-product privileges. The court labeled Sussex Commons' efforts "a fishing expedition."

On May 11, 2006, Sussex Commons submitted an OPRA request to Rutgers University. Specifically, Sussex requested the following eighteen categories of documents:

1) Documents reflecting the allocation of funds by Rutgers University to Rutgers Environmental Law Clinic for 2003, 2004, 2005 and 2006.

2) Copies of all bills to Citizens for Responsible Development at Ross' Corner from Rutgers Environmental Law Clinic.

3) Documents containing the time records and time spent for all attorneys, paralegals and secretaries of the Rutgers Environmental Law Clinic on behalf of Citizens for Responsible Development at Ross' Corner in connection with the Sussex Commons project at Ross' Corner.

4) Documents containing all disbursements on behalf of Citizens for Responsible Development at Ross' Corner in connection with the Sussex Commons project at Ross' Corner.

5) Documents containing all payments to expert witnesses on behalf of Citizens for Responsible Development at Ross' Corner in connection with the Sussex Commons project at Ross' Corner.

6) Documents containing payments made by Citizens for Responsible Development at Ross' Corner to Rutgers Environmental Law Clinic.

7) Minutes of Board and Staff meetings at which the Sussex Commons application was discussed.

8) All documents and submissions to Rutgers University and Rutgers Environmental Law Clinic by Paul Sutphen, Robert McDowell, David Mintz, Citizens for Responsible Development at Ross' Corner and Allyn Jones, prior to Rutgers Environmental Law Clinic's decision to represent Citizens for Responsible Development at Ross' Corner.

9) All documents received by the Rutgers Environmental Law Clinic from Robert McDowell.

10) All documents received by the Rutgers Environmental Law Clinic from David Mintz.

11) All documents received by the Rutgers Environmental Law Clinic from Schoor DePalma.[1]

12) All documents received by Rutgers Environmental Law Clinic from Chelsea Property Group, Inc.

13) All documents received by Rutgers Environmental Law Clinic from Pitney Hardin, LLP.

14) All documents received by Rutgers Environmental Law Clinic from Frankford Township.

15) All documents between any State agency/Sussex County agency and Rutgers Environmental Law Clinic.

16) All documents between any Sussex County agency and Rutgers Environmental Law Clinic.

17) All documents received by the Rutgers Environmental Law Clinic from any Frankford Township Land Use Board member.

18) All documents received by the Rutgers Environmental Law Clinic from any professional and/or representative of Frankford Township and/or its Land Use Board.

Rutgers' Custodian of Records initially denied the requests relying on her interpretation of *MAG Entertainment, LLC v. Division of Alcoholic Beverage Control*, 375 *N.J.Super.* 534, 868 *A.*2d 1067 (App.Div.2005). She stated that OPRA requests must clearly identify the documents sought and not ask for all documents in a particular category, and that OPRA does not require an agency to conduct open-ended searches of its files.

On September 22, 2006, Sussex Commons filed suit against Rutgers, the State University, the RELC, and Rutgers University's Custodian of Records. Sussex alleged that it was entitled to the records it had requested under OPRA and the common law right of access.[2] On March 10, 2008, Rutgers provided informa-

---

[1] Schoor DePalma is an engineering company that the CRDRC retained in connection with its opposition to the outlet mall.

[2] In its complaint, Sussex sought records under the "common law right to know and disclosure." We interpret that as a request under the common law

tion about the University's funding of the RELC for the academic years spanning 2002 to 2006, in response to Request No. 1. In response, on June 10, 2008, Sussex requested six categories of additional financial information from Rutgers related to the RELC's funding. The following day, Sussex submitted another OPRA request to Rutgers seeking ten additional categories of documents related to the RELC. Sussex later moved to supplement the record with information about the requests from the custodian.[3]

In a written decision filed on October 7, 2008, the trial court ruled that the RELC was exempt from OPRA. The court reasoned that the "unique hybrid nature" of Rutgers Law School clinics entitled them to an exemption. The court also observed that if clinics were subject to OPRA, clients would hesitate to use them out of a concern that their case files might be disclosed. The court concluded that an exemption from OPRA was "necessary to protect the unique and valuable function the law clinics provide in both education and jurisprudence." For those and other reasons, the trial court dismissed the complaint and denied Sussex Commons' motion to supplement the record.

The Appellate Division reversed. *See Sussex Commons, supra,* 416 *N.J.Super.* at 554, 6 *A.*3d 983. The panel explained that Rutgers University, a publicly funded state institution, was subject to OPRA, that the University included the law school, and that the Clinic, in turn, was part of the law school. *Id.* at 549, 6 *A.*3d 983.

---

right of access. *See Fair Share Hous. Ctr., Inc. v. N.J. State League of Municipalities,* 207 *N.J.* 489, 497 n. 4, 25 *A.*3d 1063 (2011).

[3] There is some confusion about which OPRA requests remain unanswered. Respondents conceded before the Appellate Division that they received complete responses to Request Nos. 2, 4, and 7. The Appellate Division believed that the concession applied to Request Nos. 2, 4, and 6. *Sussex Commons Assocs., LLC v. Rutgers,* 416 *N.J.Super.* 537, 545, 6 *A.*3d 983 (App.Div.2010). Also, it does not appear from the record that Request Nos. 8 through 18 are part of this appeal. None of those issues, however, are material to resolving the legal question now before the Court.

As a result, the panel concluded that the Clinic met OPRA's definition of a public agency. *Ibid.* (citing *N.J.S.A.* 47:1A–1.1). "For purposes of OPRA," the Appellate Division observed, "the Clinic is indistinguishable from any other academic program offered by the Law School." *Id.* at 550, 6 *A.*3d 983.

The panel rejected a categorical exemption from OPRA for the Clinic and noted that the Legislature instead created various specific exemptions for higher education. *Id.* at 551, 6 *A.*3d 983. Any disadvantage the Clinic might face, the court opined, would be offset by the benefit of receiving public funding. *Id.* at 552, 6 *A.*3d 983. The panel added that a blanket exemption would be illusory because the Clinic would still be subject to disclosure requests under the common law right of access. *Id.* at 553, 6 *A.*3d 983.

We granted certification. 205 *N.J.* 519, 16 *A.*3d 384 (2011). At various stages of the proceedings, the following groups were allowed to participate as amici curiae: the Law Clinics of Rutgers School of Law, Newark, and Rutgers School of Law, Camden (Rutgers Clinics); the Association of American Law Schools; and the Clinical Legal Education Association, Society of American Law Teachers, and American Association of University Professors (collectively CLEA), who submitted a joint brief.

II.

Petitioners RELC, Rutgers University, and its Custodian of Records contend that the Appellate Division ignored precedent and mistakenly concluded that OPRA applies to the RELC as "a categorical rule." Instead, they contend that *In re Determination of Executive Commission on Ethical Standards*, 116 *N.J.* 216, 561 *A.*2d 542 (1989), requires courts to determine whether a state statute applies to Rutgers on a case-by-case basis, mindful of the statute's purpose and the Legislature's concern for academic freedom at the University.

Petitioners submit that because the RELC does not perform government functions, it would not further OPRA's aim to apply the statute to the Clinic. In addition, petitioners argue that

requiring the RELC to comply with OPRA would undermine the Clinic's educational value and threaten its ability to provide pro bono legal services to clients.

Respondent Sussex Commons maintains that Rutgers University is subject to OPRA and that the RELC is part of Rutgers. As a result, Sussex contends that the RELC must comply with OPRA and can avail itself of the attorney-client privilege and other exemptions outlined in the law. Sussex urges this Court to follow the reasoning of the dissent in *In re Executive Commission on Ethical Standards, supra,* 116 *N.J.* at 233–35, 561 *A.*2d 542 (Pollock, J., dissenting), and require Rutgers to seek an exemption from OPRA from the Legislature.

All three amici support the RELC's legal position that it is not subject to OPRA. They also emphasize the value of clinical training and highlight various negative consequences if law school clinics are required to respond to OPRA requests. In short, they contend that if clinic records are subject to disclosure, the operation of clinics will be disrupted, and their ability to teach students and to attract and serve clients will be impaired.

Rutgers Clinics also argues that applying OPRA to clinical attorneys would infringe on this Court's exclusive authority to regulate the practice of law and create a potential constitutional conflict between the Legislature and the Judiciary. The Association of American Law Schools adds that client-related records created for pedagogical reasons should be categorically excluded from disclosure under this Court's case law. CLEA also submits that requiring legal clinics to comply with OPRA would infringe on a client's First Amendment right to communicate with counsel.

III.

A.

 This case requires the Court to interpret the scope of a statute—the Open Public Records Act, *N.J.S.A.* 47:1A–1 to –13. The Court's obligation when interpreting a law is to determine and

carry out the Legislature's intent. *Allen v. V. & A Bros., Inc.*, 208 *N.J.* 114, 127, 26 *A.*3d 430 (2011). To do so, courts first look at the plain language of the statute. *DiProspero v. Penn*, 183 *N.J.* 477, 493, 874 *A.*2d 1039 (2005). If it is ambiguous, courts may examine extrinsic evidence for guidance. *Burnett v. Cnty. of Bergen*, 198 *N.J.* 408, 421, 968 *A.*2d 1151 (2009). Courts may also look to extrinsic evidence "if a plain reading of the statute leads to an absurd result." *DiProspero, supra*, 183 *N.J.* at 493, 874 *A.*2d 1039. In other words, when "a literal interpretation would create a manifestly absurd result, contrary to public policy," courts may consider the law's overall purpose for direction. *Hubbard ex rel. Hubbard v. Reed*, 168 *N.J.* 387, 392, 774 *A.*2d 495 (2001) (internal quotations and citations omitted).

## B.

■ The Legislature passed OPRA in 2001 to replace the Right to Know Law. *See Fair Share Hous. Ctr., supra*, 207 *N.J.* at 497 n. 4, 25 *A.*3d 1063. OPRA requires that "government records shall be readily accessible" to the public "with certain exceptions, for the protection of the public interest." *N.J.S.A.* 47:1A–1. The law is designed to promote transparency in the operation of government. *Burnett, supra*, 198 *N.J.* at 414, 968 *A.*2d 1151. OPRA's promise of accessible public records enables "citizens and the media [to] play a watchful role in curbing wasteful government spending and guarding against corruption and misconduct." *Ibid.*

To that end, OPRA defines "government records" broadly:

[any record] made, maintained or kept on file in the course of his or its official business by any officer, commission, agency or authority of the State or of any political subdivision thereof ... or that has been received in the course of his or its official business by any such officer, commission, agency, or authority of the State or of any political subdivision thereof....

[*N.J.S.A.* 47:1A–1.1.]

OPRA defines "public agency" or "agency" to include "any of the principal departments in the Executive Branch of State Government ... and any independent State authority, commission, instrumentality or agency." *Ibid.*

■ OPRA exempts various documents from disclosure including records protected by the attorney-client privilege, inter- or intra-agency advisory, consultative, or deliberative material, pedagogical records at a public institution of higher education, and information that must be kept confidential pursuant to court order. *Ibid.* Documents covered by the work-product privilege are exempt to the extent they are protected by *N.J.S.A.* 47:1A–9. *See Gannett N.J. Partners, LP v. Cnty. of Middlesex,* 379 *N.J.Super.* 205, 218, 877 *A.*2d 330 (App.Div.2005).

## IV.

Because the OPRA request at the heart of this case sought records from Rutgers University, as well as the RELC, Rutgers' status and history help inform this matter. Rutgers University traces its origin to 1766 when King George III chartered Queen's College. *See Trs. of Rutgers Coll. v. Richman,* 41 *N.J.Super.* 259, 265, 125 *A.*2d 10 (Ch.Div.1956). For the next 190 years, it was "essentially independent." *In re Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 223, 561 *A.*2d 542. In 1956, as part of a reorganization, the college became the State University. *Ibid.* That plan "created a hybrid institution—at one and the same time private and public, with the State being granted a major voice in management, and the designation 'State University'; and the institution being granted private autonomy and control of physical properties and assets." *Trs. of Rutgers Coll., supra,* 41 *N.J.Super.* at 289–90, 125 *A.*2d 10.

"Rutgers, the State University law," adopted in 1967, *see L.* 1967, *c.* 271, captures Rutgers' unique status: it declares as the public policy of the State not only that "the university shall be . . . given a high degree of self-government, [which] shall be free of partisanship" but also that State funding be provided "for the conduct of a State university with high educational standards." *N.J.S.A.* 18A:65–27(I)(a) & (b). As this Court observed in *In re Executive Commission on Ethical Standards, supra,* "the absorption of Rutgers University within the framework of State-supported education has been marked by an overriding concern for

the academic freedom of one of the nation's oldest and greatest universities." 116 *N.J.* at 223, 561 *A.*2d 542.

Consistent with Rutgers' distinct status, courts have not adopted a bright-line rule that treats Rutgers as an arm of the State for all purposes. *See, e.g., Kovats v. Rutgers,* 822 *F.*2d 1303, 1312, 1312 n. 10 (3d Cir.1987) (concluding Rutgers is not arm of State entitled to immunity under Eleventh Amendment and is thus subject to liability under federal civil rights laws); *Krebs v. Rutgers,* 797 *F.Supp.* 1246, 1256 (D.N.J.1992) (concluding Rutgers is not state agency subject to federal Privacy Act of 1974); *Fine v. Rutgers,* 163 *N.J.* 464, 468, 472–73, 750 *A.*2d 68 (2000) (concluding Rutgers is public agency for purpose of venue rule and noting University is public entity under Tort Claims Act); *In re Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 224, 561 *A.*2d 542 (reviewing cases); *Rutgers v. Piluso,* 60 *N.J.* 142, 158, 286 *A.*2d 697 (1972) (regarding Rutgers as State facility for purpose of immunity from local land-use regulations); *Frank Briscoe Co. v. Rutgers,* 130 *N.J.Super.* 493, 505–06, 327 *A.*2d 687 (Law Div.1974) (concluding Rutgers is not subject to Contractual Liability Act); *Rutgers v. Piscataway Twp.,* 1 *N.J.Tax* 164, 169 (Tax Ct.1980) (treating land owned by Rutgers as State property subject to payments in lieu of property taxes).

Courts have instead "resolved the question of whether general state statutes apply to Rutgers by considering both the purposes of the general program and the purposes of the Rutgers legislative charter." *In re Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 221, 561 *A.*2d 542 (citing *Piluso, supra,* 60 *N.J.* at 142, 286 *A.*2d 697). A simple principle helps guide that analysis: "[t]he fact that there is State involvement in education should never be a disadvantage." *Id.* at 223, 561 *A.*2d 542.

## V.

### A.

■ At the outset, we note that this lawsuit is not about whether Rutgers University is subject to OPRA. Petitioners con-

cede that it is. OPRA's broad definition of "public agency" encompasses the University, and the statute's goal of making public records accessible and transparent applies as well. *See N.J.S.A.* 47:1A–1 & –1.1; *see also Keddie v. Rutgers,* 148 *N.J.* 36, 43–48, 689 *A.*2d 702 (1997) (applying Right to Know Law to Rutgers University). At the very least, the public has the right to confirm that taxpayer funds for higher education are being used properly.

The same is true for Rutgers' law schools. At oral argument, the current Dean of Rutgers Law School–Newark, on behalf of amici Rutgers Clinics, conceded that OPRA applies to the Law School. The University and the Law School are therefore required under OPRA to disclose records about public funding for clinical programs.[4] Rutgers prepared and sent a letter to Sussex Commons with that information—about University funding of the RELC for the academic years covering 2002 to 2006—even though OPRA does not require public agencies to create records. *See MAG Entm't, supra,* 375 *N.J.Super.* at 546, 549, 868 *A.*2d 1067.

## B.

This case presents a narrower issue: whether records related to clinical cases at public law school clinics are subject to OPRA. In addressing that question, we consider whether the Legislature intended to apply OPRA to teaching clinics that function like private law firms as they serve individual clients.

The Court tackled a similar question in *In re Executive Commission on Ethical Standards, supra,* when it held that clinical law professors at Rutgers were not "State employees" for purposes of the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 to –27. 116 *N.J.* at 218, 561 *A.*2d 542. The precise issue in the case was whether the conflicts law prevented lawyers from a Rutgers constitutional law clinic from appearing before the

---

[4] Private donations to public institutions of higher education are subject to OPRA's charitable gifts exception at *N.J.S.A.* 47:1A–1.1.

Council on Affordable Housing (COAH). *Id.* at 218, 229, 561 *A*.2d 542. The statute barred "State employees" from representing private clients before State agencies. *See id.* at 220, 561 *A*.2d 542. Thus, a law professor considered a "State employee" could not represent private clients before COAH.

The Court focused its analysis on the purpose of the conflicts law, which sought to eliminate the practice of part-time legislators and other public officials appearing before agencies the government regulated. *Id.* at 220, 226, 561 *A*.2d 542. The law targeted actual conflicts as well as the appearance of conflict and undue influence. *Id.* at 220, 561 *A*.2d 542.

The Court reviewed the statutory bar and the conflicts law's broad definition of "State agency"—which is identical to OPRA's definition of "public agency" in all relevant respects. *Compare N.J.S.A.* 52:13D–13(a) *with N.J.S.A.* 47:1A–1.1. The Court then asked whether the teaching role of a Rutgers' clinical professor evoked the concerns that prompted the conflicts law and whether the law would frustrate the University's charter. *In re Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 221–22, 561 *A*.2d 542. Against the backdrop of Rutgers' history and status, and the importance of clinical legal education, the Court found "no risk of undue influence or appearance of undue influence posed by a university professor conducting a teaching program whose mission extends to . . . a State agency." *Id.* at 226, 561 *A*.2d 542.

The Court noted that the situation was not "within the contemplation" of the goals of the conflicts law. *Id.* at 227, 561 *A*.2d 542. The Court also affirmatively declared, "[w]e do not believe that the Legislature ever would have intended to disable a clinical education program at our State University." *Id.* at 218, 561 *A*.2d 542. As further support for its holding, the Court observed that "it has never been the law," for all purposes, that Rutgers is an "alter-ego of the State" or that the members of its teaching faculty are State employees. *Id.* at 227, 561 *A*.2d 542.

The holding invited a thoughtful and forceful dissent. *See id.* at 230, 561 *A*.2d 542 (Pollock, J., dissenting). The dissent believed

that the definitional parts of the conflicts law encompassed Rutgers, and that the Legislature had not provided an exemption for Rutgers clinical professors. *Id.* at 230–31, 233, 561 *A.*2d 542.

Of critical importance today, we note that the Court decided *In re Executive Commission on Ethical Standards* more than a decade before the Legislature enacted OPRA. Despite an invitation from the Court to overturn its holding, the Legislature did not do so. *See id.* at 229, 561 *A.*2d 542 (majority opinion). Instead, it is telling that the Legislature drafted OPRA in 2001 with full knowledge of the earlier decision and its reasoning. *See Coyle v. Bd. of Chosen Freeholders,* 170 *N.J.* 260, 267, 787 *A.*2d 881 (2002) ("There is a long-standing canon of statutory construction that presumes that the Legislature is knowledgeable regarding the judicial interpretation of its enactments.").

The rationale of *In re Executive Commission on Ethical Standards* applies with equal force here. OPRA is designed to ensure that "government records" are accessible "for the protection of the public interest." *N.J.S.A.* 47:1A–1. "Government records" are those documents prepared or kept in the course of official business by any officer or agency. *N.J.S.A.* 47:1A–1.1. In *In re Executive Commission on Ethical Standards, supra,* the Court rejected the approach Sussex Commons urges today: to conclude, with little additional analysis, that law school clinics that are part of a state-funded institution are subject to the terms of a general statute like OPRA. Instead, we consider the statute, its purpose, and whether its application to clinical legal programs would thwart Rutgers' mission. *See In re Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 221, 561 *A.*2d 542.

By its very terms, OPRA seeks to promote the public interest by granting citizens access to documents that record the workings of government in some way. That important aim helps serve as a check on government action.

Clinical legal programs, though, do not perform any government functions. They conduct no official government business and do not assist in any aspect of State or local government. Instead,

they teach law students how to practice law and represent clients. In addition, not even the University, let alone any government agency, controls the manner in which clinical professors and their students practice law.

As a result, we do not see how it would further the purposes of OPRA to allow public access to documents related to clinic cases. Unlike a request for documents about the funding of a clinic or its professors' salaries, which are discoverable under OPRA, case-related records would not shed light on the operation of government or expose misconduct or wasteful government spending. *See Burnett, supra*, 198 *N.J.* at 414, 968 *A.*2d 1151. The possibility of disclosure, however, would have real consequences for clinical education.

The RELC and amici outline various concerns if law school clinics are subjected to OPRA: people in need of legal assistance might hesitate to use a public law school clinic out of fear that their records could be disclosed; clients might be reluctant to communicate freely with their counsel; and outside law firms might refrain from working with clinics on particular matters. The groups also contend that OPRA's presumption of access would diminish clinical training by making it less like the actual practice of law. In essence, they argue that the academic freedom of law school clinics would be undermined.

The application of OPRA to public law clinics would also open the door to additional, and perhaps vexatious, OPRA requests in the future. Clinics, in turn, would have to divert attention and resources away from training students and serving clients to respond to those requests. In this case, for example, Sussex Commons initially requested eighteen different categories of items, including all documents the RELC received from any State agency, Sussex County agency, or the local land use board— without limitation. Sussex Commons also sought documents the RELC received from the Pitney Hardin law firm, which Sussex had failed to obtain in discovery in the Chelsea litigation. Even if documents were protected under one of OPRA's exemptions, law

school clinics would still have to shoulder the administrative burden of preparing for, responding to, and possibly litigating over each item requested.

It is difficult to measure the precise impact of the above concerns. But the consequences are likely to harm the operation of public law clinics and, by extension, the legal profession and the public.

Applying OPRA to the RELC and similar clinical programs would also lead to the following absurd result: public law school clinics would be subject to disclosure of their records, and private law school programs would not. In other words, there would be two classes of clinics at New Jersey's law schools, with public educational programs disadvantaged solely because they are public. That outcome would be contrary to the principles of *In re Executive Commission on Ethical Standards, supra,* 116 *N.J.* at 223, 561 *A.*2d 542.

Nothing suggests that the Legislature intended those results when it enacted OPRA, and we do not believe the Legislature meant to harm clinical legal programs when it drafted that important law. Indeed, it would be ironic if the State's statutory obligation to provide adequate resources for high quality public education at Rutgers, *see N.J.S.A.* 18A:65–27(I)(b), created a basis to invoke OPRA and thereby weaken an academic program. To the contrary, the Legislature has repeatedly demonstrated its intent to support Rutgers and higher education for the benefit of the citizens of this State. *See In re Exec. Comm'n on Ethical Standards, supra,* 116 *N.J.* at 223, 561 *A.*2d 542 (citing *Piluso, supra,* 60 *N.J.* at 158, 286 *A.*2d 697).

■ We conclude that records related to cases at public law school clinics are not subject to OPRA. That ruling encompasses client-related documents or clinical case files, as well as requests for information about the development and management of litigation—like the requests presented in this case. The Legislature is free to act if we have misread its intent.

## VI.

 Sussex Commons also sought RELC records under the common law right of access. The common law right extends to "written records 'made by public officers in the exercise of public functions.'" *N. Jersey Newspapers Co. v. Passaic Cnty. Bd. of Chosen Freeholders,* 127 *N.J.* 9, 13, 601 *A.2d* 693 (1992) (quoting *Nero v. Hyland,* 76 *N.J.* 213, 221–23, 386 *A.2d* 846 (1978)). Access to those materials involves a balancing of interests. A requestor must demonstrate an interest in the public record, which must "outweigh the State's interest in non-disclosure." *See Educ. Law Ctr. v. N.J. Dep't of Educ.,* 198 *N.J.* 274, 302, 303, 966 *A.2d* 1054 (2009) (citations omitted).

 Because clinical professors at public law schools do not act as public officers or conduct official business when they represent private clients at a law school clinic, the common law right of access does not extend to records maintained in that setting.

## VII.

For the reasons stated above, we reverse the judgment of the Appellate Division.

Justice ALBIN, concurring.

Rutgers, The State University is subject to the provisions of the Open Public Records Act (OPRA or Act), *N.J.S.A.* 47:1A–1 to – 13—a point no one disputes. Rutgers School of Law—Newark is a subdivision of the University, and the Rutgers Environmental Law Clinic (the Clinic) is an integral part of the law school. All three, to some extent or another, receive state funding.

Unlike the majority, I cannot discern anything within the framework or legislative history of OPRA suggesting that the Clinic does not fall within the sweep of the Act. However, that conclusion does not spell doom for the Clinic. OPRA only requires that the law school or Clinic disclose "government records," and does not require disclosure of records that are exempt under the Act. In

this case, the records sought by plaintiffs—other than those related to the Clinic's funding—either do not fall within the definition of a government record or fall within an exempt category.[1] I reach the same destination as the majority but by the pathway of a plain reading of the statute. Therefore, I concur with the majority that the Clinic does not have to comply with plaintiffs' document request.

OPRA is a carefully crafted statutory scheme. On the one hand, it requires disclosure of documents that will shine light on the operations of government so that an informed citizenry can exercise oversight over elected and appointed officials and participate fully in the democratic process. *See N.J.S.A.* 47:1A-1 (setting forth legislative findings underpinning OPRA); *Mason v. City of Hoboken,* 196 *N.J.* 51, 64–65, 951 *A.2d* 1017 (2008). On the other hand, it exempts other documents from disclosure that would be inimical to the public interest or other important public values. *See N.J.S.A.* 47:1A-1.1 (exempting twenty-one categories of information from OPRA's disclosure requirements). Thus, OPRA exempts from disclosure certain categories of documents in which the value of disclosure is outweighed by the need to maintain privacy or confidentiality.

The same exemptions that protect attorneys who are employed in some governmental capacity—county and municipal prosecutors, municipal public defenders, county and municipal counsel, and a host of other publicly funded lawyers—equally protect the Clinic and its lawyers. All records relating to the attorney-client and work-product privileges are exempt from disclosure. *N.J.S.A.* 47:1A-1.1 (including attorney-client privilege among categorical exemptions to OPRA); *N.J.S.A.* 47:1A-9 (stating that privileges granted by court rule which "may duly be claimed to restrict public access to a public record or government record" shall

---

[1] Although funding-related records are generally subject to disclosure under OPRA, the University's "records of pursuit of charitable contributions" are exempt, as are records that would reveal the identity of a donor whose gift to the University is conditioned upon remaining anonymous. *N.J.S.A.* 47:1A-1.1.

remain unaffected by OPRA); *see R.* 4:10–2(c) (describing attorney work-product privilege).

Significantly, the Clinic has further protections under OPRA. Because the Clinic is part of a university and law school—institutions of higher education—records falling within the pedagogical privilege are exempt from the definition of government record. *See N.J.S.A.* 47:1A–1.1. Moreover, OPRA's definition of "government record" specifically excludes "deliberative material." *N.J.S.A.* 47:1A–1.1. Under this carve-out, "a record, which contains or involves factual components, is entitled to deliberative-process protection when it was used in the decision-making process and its disclosure would reveal deliberations that occurred during that process." *Educ. Law Ctr. v. N.J. Dep't of Educ.,* 198 *N.J.* 274, 280, 966 *A.*2d 1054 (2009).

Taken together, this passel of exemptions shield the Clinic from all of plaintiffs' document requests, except for those related to funding. It bears mentioning that at oral argument before this Court, plaintiffs' counsel was unable to identify any category of requested documents—unrelated to funding—not encompassed within one of the exemptions or privileges that allow for non-disclosure.

In summary, I find that not only does OPRA apply to the Clinic, but that it provides the Clinic with all the protection it needs to fulfill its special mission to its law students and clients. I do not come to any different conclusion applying the common-law right of access. I respectfully concur with the result of the majority.

*For reversal*—Chief Justice RABNER and Justices LaVECCHIA, ALBIN, HOENS, and Judge WEFING (temporarily assigned)—5.

*Not Participating*—Justice PATTERSON—1.

*Opposed*—None.