69 A.3d 118

JOHN PAFF, PLAINTIFF–APPELLANT, v. NEW JERSEY STATE
FIREMEN'S ASSOCIATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued November 1, 2012—Decided June 13, 2013.

Before Judges MESSANO, LIHOTZ and OSTRER.

*Richard Gutman* argued the cause for appellant.

*John C. Gillespie* argued the cause for respondent (*Parker McCay P.A.*, attorneys; *Mr. Gillespie* and *George M. Morris*, of counsel; *Stacy L. Moore, Jr.*, on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

The issue in this appeal is whether the New Jersey State Firemen's Association (the Association) is a "public agency," *N.J.S.A.* 47:1A–1.1, under the Open Public Records Act (OPRA), *N.J.S.A.* 47:1A–1 to –13. The Association maintains it is not a public agency; therefore, OPRA did not require it to permit plaintiff to inspect its records. The trial court agreed and dismissed plaintiff's verified complaint to compel access. As we conclude that the Association is a public agency under OPRA, we reverse and remand.

I.

In order to determine whether the Association is a "public agency" under OPRA, we must review in some detail the Association's powers, funding, and mission, as set forth in relevant statutes and regulations.

The Association was established pursuant to an 1885 statute. *L.* 1885, *c.* 122, § 24. The Association was organized by the several incorporated local firemen's relief associations, whose mission was to provide assistance to indigent firefighters and their families. *Ibid.* The Association was authorized to conduct an annual convention, and to oversee activities of the local associations. *L.* 1885, *c.*

122, §§ 26–28. The local associations were funded with the direct payment of a tax on premiums of fire insurance companies not organized under New Jersey law, but doing business here. *L.* 1885, *c.* 240, § 1. The amount collected was deemed part of the reciprocal tax collected by the State's tax authorities. *L.* 1885, *c.* 240, § 8. Local associations were required to file an annual report of their organization's officers and finances with the State and the Association. *L.* 1885, *c.* 122, § 28. The Association in turn was required to report to the State regarding local associations' compliance with the law. *L.* 1885, *c.* 122, § 29.

The powers and role of the Association changed over time, as a result of amendatory statutes, Department of Banking and Insurance regulations, and a judicial decision, *Szabo v. New Jersey State Firemen's Association,* 230 *N.J.Super.* 265, 553 *A.*2d 371 (Ch.Div.1988). The plaintiff in *Szabo* alleged the mechanism for funding the Association and local associations was an unconstitutional donation of money under *N.J. Const.* art. VIII, § 3, ¶ 3, and the grant of power to the Association was an unconstitutional delegation of legislative authority, contrary to *N.J. Const.* art. IV, § 1, ¶ 1. *Szabo, supra,* 230 *N.J.Super.* at 268–69, 553 *A.*2d 371. Szabo claimed the Association was a " 'private' rather than a public body." *Id.* at 285 n. 15, 553 *A.*2d 371. "Defendant [the Association] dispute[d] that characterization." *Ibid.*

The court did not decide whether the Association was a private or public body. *Ibid.* The court construed the statute governing the local associations, *N.J.S.A.* 43:17–1 to –39, and the Association, *N.J.S.A.* 43:17–40 to –47, to avoid a constitutional challenge. The court required the Association to adopt regulations governing the local associations' benefit decisions. *Id.* at 290, 553 *A.*2d 371. The court also required greater State governmental oversight of the Association and local associations. *Id.* at 294, 553 *A.*2d 371.

The Association was later delegated expanded powers to oversee and regulate the activities of local associations. The governance of local associations must comply with rules and regulations adopted by the Association's executive committee. *L.* 1996, *c.* 151,

§ 8, *codified at N.J.S.A.* 43:17–10. Decisions by local associations regarding requests for financial assistance shall also comply with the executive committee's rules and regulations. *L.* 1996, *c.* 151, § 21, *codified at N.J.S.A.* 43:17–24. The Association has the power to seize control of a local association's assets and management if the local association violates the law or the Association's regulations. *L.* 1996, *c.* 151, § 24, *codified at N.J.S.A.* 43:17–27.

The Association also exercises oversight over the expenses incurred by local associations at the Association's annual convention. *L.* 1996, *c.* 151, § 25, *codified at N.J.S.A.* 43:17–29. The Association is expressly authorized to make direct benefit payments. *L.* 1996, *c.* 151, § 33, *codified at N.J.S.A.* 43:17–41. Even before this enactment, the Association in practice directly administered burial fund benefits, generally without regard to financial need. *See Szabo, supra,* 230 *N.J.Super.* at 273, 275, 553 *A.*2d 371.

Insurers not organized under New Jersey law or their agents are now required to pay the two percent tax on fire insurance premiums directly to the Association, which it then disburses to local associations, and as benefit payments. *L.* 1997, *c.* 41, §§ 1 and 2, *codified at N.J.S.A.* 54:18–1 and –2.[1] Likewise, agents of surplus lines carriers are required to pay the three percent tax on fire insurance premiums directly to the Association. *L.* 2009, *c.* 75, § 4, *codified at N.J.S.A.* 17:22–6.59.[2] The Association in turn disburses funds to the local associations in proportion to the premiums collected in the municipality served by the local associa-

---

[1] The 1997 amendments were drafted "as a result of hearings held by the Senate Law and Public Safety Committee to investigate criticisms of the collection and distribution of funds by the New Jersey State Firemen's Association" and "to codify the procedures governing the tax monies collected and distributed by the [A]ssociation." *Fiscal Note to Senate Bill No. 253 (1st reprint)* (Dec. 5, 1996).

[2] According to the legislative history, *L.* 2009, *c.* 75, § 4, was intended to approve the prior practice of direct payment of "the premium receipts tax" to the Association, notwithstanding that the statute then specified payment to local associations. Senate Law and Public Safety and Veterans' Affairs Committee, *Statement to Senate No. 1854* (June 5, 2008).

tion. *N.J.S.A.* 54:18–2; *N.J.A.C.* 11:1–38.5(a)(3). The Association's executive committee "shall have the supervision and power of control of the funds" of local associations and shall report to the Banking and Insurance Commissioner whether local associations have complied with the law. *N.J.S.A.* 43:17–45. Only local associations in compliance may receive their share of premium tax revenue. *Ibid.*

The Department of Banking and Insurance codified procedures for the review and auditing of local associations' financial reports. *See* 28 *N.J.R.* 1384(a) (Mar. 4, 1996) (adopting regulations, codified at *N.J.A.C.* 11:1–38.1 to –6, governing the Association's oversight of local associations). The rules were intended to "help ensure that monies in the possession of and under the control of the Firemen's Relief Associations are properly expended for public purposes reasonably related to the benevolent programs that they conduct, in accordance with the intent of the Legislature and the decision of the court in *Szabo.*" 27 *N.J.R.* 635 (Feb. 21, 1995). In its regulatory flexibility analysis, the Department characterized the local associations as "quasi-public entities created by statute[.]" *Ibid.* Surplus lines producers are required to report fire premiums and taxes payable to the State Association and the Insurance Department. *See N.J.A.C.* 11:19–3.5.

The Association also disburses revenues—generated by premiums collected in municipalities that lack a local association—in support of the New Jersey Firemen's Home (Firemen's Home). *L.* 1997, *c.* 41, § 7, *codified at N.J.S.A.* 54:18–8. The Association is authorized to approve or disapprove funding of capital projects for the Firemen's Home, subject to appeal and review by the Commissioner of Banking and Insurance. *Ibid.* Previously, funds for the Firemen's Home were paid to the State Treasurer, who disbursed them to the Firemen's Home. Assembly Law and Public Safety Committee, *Statement to Senate Bill No. 253 (1st reprint )* (Sept. 16, 1996).

The 1997 amendments also empowered the Commissioner of Banking and Insurance and the State Treasurer to enforce the

revenue-related provisions, *N.J.S.A.* 54:18–1 to –8, and to require the Association's treasurer "to provide a certified annual accounting of the monies received and allocated under the provisions of this chapter [*N.J.S.A.* 54:18–1 to –8] and *N.J.S.A.* 43:17–1 et seq." *L.* 1997, *c.* 41, § 6, *codified at N.J.S.A.* 54:18–7. The two cabinet officers are also charged with holding the Association's "treasurer and officers accountable" and "subject[ing] them] to the penalties provided[.]" *Ibid.*

Benefits decisions have been subject to judicial review to determine adherence to statutory standards. *See Szabo, supra,* 230 *N.J.Super.* at 282–84, 553 *A.*2d 371 (finding the Association violated statute by imposing a quota on membership when membership exceeded limits the Association established, and by applying a health test for Association membership notwithstanding firefighter was already deemed fit to serve as a firefighter in his locality); [3] *Taffey v. N.J. State Firemen's Ass'n,* 118 *N.J.L.* 352, 355–56, 192 *A.* 725 (Sup.Ct.1937) (affirming judgment awarding plaintiff burial benefit and rejecting Association's argument that deceased firefighter was ineligible because he was not a citizen when he began serving as a firefighter); *Magnus v. N.J. State Firemen's Ass'n,* 14 *N.J. Misc.* 426, 427–28, 185 *A.* 658 (Sup.Ct.1936) (affirming judgment awarding burial benefits and rejecting Association's argument that firefighter was required to be citizen when he began service); *N.J. State Firemen's Ass'n v. Gildea,* 14 *N.J. Misc.* 14, 17, 182 *A.* 23 (Ch.1935) (finding reasonable Association's regulations regarding priority of claim by competing survivors of deceased firefighter to burial benefit).[4]

---

[3] The Legislature subsequently amended the statute to expressly empower the Association to establish its own health standards for membership. *See L.* 1989, *c.* 105, § 1, *codified at N.J.S.A.* 43:17–9. The provision was intended to restore the Association's "longstanding practice of requiring all new members to pass an appropriate physical examination." Senate Law, Public Safety and Defense Committee, *Statement to Senate Bill No. 3136* (Jan. 26, 1989).

[4] The Association at some point adopted a rule that characterized its benefit payments as "gratuities or voluntary payments ... not ... the subject of judicial

While elected delegates and chiefs of local associations and others "shall conduct the affairs" of the Association, *N.J.S.A.* 43:17–41, the Association's executive committee supervises and exercises control over local association funds and property. *N.J.S.A.* 43:17–45. The Association maintains a private pension plan for its employees, which is not a part of any public pension system, such as the Police and Firemen's Retirement System. There has been at least one significant reported instance· of misconduct involving the handling of the Association's funds. *See State v. Pulasty,* 136 *N.J.* 356, 358, 642 *A.*2d 1392 (1994) (describing indictment charging Association's treasurer with embezzling over $600,000 from the Association, and the defendant's 1986 guilty plea to second-degree theft by deception).

Although we ground our decision principally on the Association's statutory powers, we also rely on undisputed facts regarding the Association's activities. The Association includes 538 local associations, representing over 76,000 volunteer and career firefighters. To qualify for benefits under the General Relief Fund, a firefighter must be between the ages of eighteen and forty-five at the time of joining. *N.J.S.A.* 43:17–9. In order to qualify for a burial benefit, a firefighter must have served seven years, and answered sixty percent of the alarms in his or her municipality over a designated time period. *See Szabo, supra,* 230 *N.J.Super.* at 284, 553 *A.*2d 371.

The Association disbursed over $7.6 million for 799 burial benefit claims in 2010. The benefits ranged in 2011 from $6000 to $10,000—depending on years of qualified service. However, when a death occurred in the line of duty, the burial benefit was tripled.

process" and declared that any legal claim for benefits was "determined to be contrary to the purposes of this Association, and any such proceedings shall forthwith operate as a bar and forfeiture of any and all benefits or claims or monies otherwise payable[.]" *Szabo, supra,* 230 *N.J.Super.* at 274, 553 *A.*2d 371 (quotation omitted). The *Szabo* court declared that clause, and a similar one, "indefensible" and noted the Association did not attempt to defend them. *Id.* at 291 n. 19, 553 *A.*2d 371.

The local associations paid just under $5 million in relief payments in 2010. Also, the local associations incurred almost $2.5 million in expenses for the annual Association convention that year.[5] On the revenue side, almost $25 million in premium tax receipts were distributed in 2010. Total assets of the local associations in 2010 exceeded $144 million.

Plaintiff is a life ·member of the Association. In September 2011, he asked the Association for an OPRA records request form, and requested access to pension records of the Association's executive committee members, and bills for legal services the Association received in March 2011. The Association responded it was not a "public agency" and therefore was not subject to OPRA requirements. Although the Association provided plaintiff some of the requested documents based on his membership status, it did not provide an OPRA form and refused access to the individual pension records of the executive committee. Plaintiff then filed his verified complaint against the Association. He alleged the Association failed to respond timely to his document request; failed to have a required request form and designated records custodian; and violated OPRA by denying access to records. He also alleged a common law right of access to records, which is not a subject of his appeal. The court entered an order compelling the Association to show cause on January 6, 2012 why requested relief should not be granted. In response, the Association moved to dismiss the complaint.

After hearing oral argument on the return date, the court entered an order on February 17, 2012 dismissing the complaint. The court concluded in a written decision that OPRA did not govern the Association. The court rejected plaintiff's principal argument that the Association was a public agency because it was an instrumentality created by a combination of political subdivi-

---

[5] In *Szabo, supra,* the court noted, "Convention expenses are substantial and, in a number of municipalities convention expenses exceed the sum paid out in benefits to fire fighters and their families." 230 *N.J.Super.* at 271 n. 4, 553 *A.2d* 371.

sions. The court denied a motion to reconsider, and this appeal followed.

## II.

The sole issue before us is whether the Association is a "public agency" under OPRA. If the Association is not a "public agency," then it is not subject to the obligations under OPRA to promulgate a records request form, *N.J.S.A.* 47:1A–5(f); to designate a records custodian, *see N.J.S.A.* 47:1A–1.1; or to provide public access to records not governed by an exemption. *N.J.S.A.* 47:1A–1, – 1.1, –9, and –10.

## A.

We review this legal question de novo. *See Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995) ("A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."); *see also K.L. v. Evesham Twp. Bd. of Educ.*, 423 *N.J.Super.* 337, 349, 32 *A.*3d 1136 (App.Div.2011) (court reviews de novo trial court determination regarding applicability of OPRA), *certif. denied*, 210 *N.J.* 108, 40 *A.*3d 732 (2012).

The governing provision defines "public agency" as:

any of the principal departments in the Executive Branch of State Government, and any division, board, bureau, office, commission or other instrumentality within or created by such department; the Legislature of the State and any office, board, bureau or commission within or created by the Legislative Branch; and any independent State authority, commission, instrumentality or agency. The terms also mean any political subdivision of the State or combination of political subdivisions, and any division, board, bureau, office, commission or other instrumentality within or created by a political subdivision of the State or combination of political subdivisions, and any independent authority, commission, instrumentality or agency created by a political subdivision or combination of political subdivisions.

[*N.J.S.A.* 47:1A–1.1.]

Reading the provision in light of the Legislature's intent, we conclude that the Association is an "independent State . . . instrumentality" subject to OPRA.

We do not write on a clean slate. Our Supreme Court has, in three cases, provided guidance for determining whether an entity is encompassed by the "public agency" definition. In *Sussex Commons Associates, LLC v. Rutgers, the State University*, 210 *N.J.* 531, 46 *A*.3d 536 (2012), the Court determined that while Rutgers and its law schools were public agencies whose records were subject to OPRA, a law school environmental law clinic was not. In *Fair Share Housing Center, Incorporated v. New Jersey State League of Municipalities*, 207 *N.J.* 489, 504, 25 *A*.3d 1063 (2011), the Court held that the League of Municipalities, a non-profit, unincorporated association, created pursuant to statute to secure concerted action by municipalities, was a public agency, even if the League did not perform a "traditional governmental task." In *The Times of Trenton Publishing Corporation v. Lafayette Yard Community Development Corporation*, 183 *N.J.* 519, 535–36, 874 *A*.2d 1064 (2005), the Court held that a private, non-profit corporation authorized to issue tax exempt bonds, and redevelop an urban site, was a public agency; it was controlled by the city, and created with its essential approval.

The Court has been guided by the statutory command that OPRA " 'shall be construed in favor of the public's right of access.' " *League of Municipalities, supra*, 207 *N.J.* at 501, 25 *A*.3d 1063 (quoting *N.J.S.A.* 47:1A–1). Where the statute is unclear, the Court has construed it in a way consistent with its broad purpose. *Rutgers, supra*, 210 *N.J.* at 541, 46 *A*.3d 536; *cf. League of Municipalities, supra*, 207 *N.J.* at 502, 25 *A*.3d 1063. "OPRA's clear purpose . . . is 'to maximize public knowledge about public affairs in order to ensure an informed citizenry and to minimize the evils inherent in a secluded process.' " *Educ. Law Ctr. v. N.J. Dep't of Educ.*, 198 *N.J.* 274, 284, 966 *A*.2d 1054 (2009) (quoting *Mason v. City of Hoboken*, 196 *N.J.* 51, 64, 951 *A*.2d 1017 (2008)). "OPRA's promise of accessible public records enables 'citizens and the media [to] play a watchful role in curbing wasteful government spending and guarding against corruption and misconduct.' " *Rutgers, supra*, 210 *N.J.* at 541, 46 *A*.3d 536

(quoting *Burnett v. Cnty. of Bergen,* 198 *N.J.* 408, 414, 968 *A.*2d 1151 (2009)).

The Court has acknowledged that the definition of "public agency" is broad. *Rutgers, supra,* 210 *N.J.* at 544, 46 *A.*3d 536. Moreover, a court must look behind the technical form of an entity to consider its substantive attributes. The cases demonstrate that determining whether an entity is a public agency involves a fact-sensitive inquiry. The Court in *Lafayette Yard, supra,* 183 *N.J.* at 535, 874 *A.*2d 1064, refused to focus on the fact that the redevelopment corporation technically was incorporated by private citizens. The Court stated that to do so would "elevate form over substance to reach a result that subverts the broad reading of OPRA as intended by the Legislature." *Ibid.*

In *League of Municipalities, supra,* the Court noted that OPRA did not define "instrumentality" of the State or a political subdivision, as used in the "public agency" definition. 207 *N.J.* at 503, 25 *A.*3d 1063. The Court assigned it the generally accepted meaning as " '[a] thing used to achieve an end or purpose' and, alternatively, as '[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body.' " *Ibid.* (quoting *Black's Law Dictionary* 814 (8th ed.2004)).

The Court expressly noted that OPRA, unlike the Open Public Meetings Act (OPMA), *N.J.S.A.* 10:4-6 to –21, enacted before it, does not expressly require that an entity perform a traditional governmental function to qualify as a public agency. *Id.* at 505–06, 25 *A.*3d 1063. "The definition of 'public agency' is far more encompassing [than "public body" under OPMA] and specifically lacks a governmental-function test. The more sweeping language of 'public agency' interdicts creative efforts that might thwart the public's efforts to access governmental records." *Id.* at 505, 25 *A.*3d 1063 (citing *N.J.S.A.* 47:1A–1.1).

It may be sufficient to establish that an entity was created and controlled by a political subdivision. In *League of Municipalities, supra,* the Court found it sufficient that the municipalities created the League as their instrumentality. *Id.* at 503–04, 25 *A.*3d 1063.

The Court in *Lafayette Yard, supra,* found it dispositive that the City of Trenton controlled the redevelopment corporation, and it could only have been created with the city's approval. 183 *N.J.* at 535–36, 874 *A.*2d 1064; *see also League of Municipalities, supra,* 207 *N.J.* at 507, 25 *A.*3d 1063 (stating that in *Lafayette Yard,* "[t]he creation test, not the governmental-function test, controlled").

The *League of Municipalities* Court viewed proof that an entity performs a public governmental function to be an "additional qualification" in OPMA that was not imported into OPRA. 207 *N.J.* at 506, 25 *A.*3d 1063. While proof of governmental function is not necessary to qualify an entity as a public agency, the Court did not preclude the possibility that such proof would be relevant and perhaps sufficient to qualify the entity. Indeed, one of OPRA's principal aims is to improve governmental operations through public access. "By its very terms, OPRA seeks to promote the public interest by granting citizens access to documents that record the workings of government in some way. That important aim helps serve as a check on government action." *Rutgers, supra,* 210 *N.J.* at 546, 46 *A.*3d 536.

In *Rutgers,* the Court considered significant that "[c]linical legal programs ... do not perform any government functions." *Ibid.* Also pertinent, neither the University nor any government agency "control[led] the manner in which clinical professors and their students practice[d] law." *Id.* at 547, 46 *A.*3d 536. Consequently, the Court concluded public access would not further OPRA's purposes. *Ibid.* "Unlike a request for documents about the funding of a clinic or its professors' salaries, which are discoverable under OPRA, case-related records would not shed light on the operation of government or expose misconduct or wasteful government spending." *Ibid.* On the other hand, disclosure would undermine the goals and effectiveness of clinical education. *Ibid.*

### B.

██ Applying these principles, we conclude that the Association's formation, structure, and function render it a public agency

under OPRA. Although organized by delegates of the local associations, *L.* 1885, *c.* 122, § 24, to say the Association is merely a creature of private non-profit relief associations is as misleading as characterizing the redevelopment corporation in *Lafayette Yard* as a creation of local citizens. The Association owes its existence to state law, which authorized its creation, granted it powers, including powers over local associations, and barred the creation of a competing state association. *N.J.S.A.* 43:17–41.

The Association's financial activities implicate OPRA's aim to shed light on the fiscal affairs of government, and to combat waste, misconduct and corruption. The Association is the direct recipient of substantial revenues generated from specific taxes imposed on insurance premiums. It is delegated authority to assure those funds are spent in accord with statutory strictures. It disburses funds directly in the form of burial benefits, and both regulates and oversees the disbursement of relief benefits by local associations to which it distributes funds.

In a formal opinion, the Attorney General relied on a volunteer fire company's receipt of substantial municipal financial support in determining that the fire company was an "agency" or "authority" of a municipality, and a "political subdivision" of the State under the Destruction of Public Records Law, *N.J.S.A.* 47:3–15 to –32. Attorney General Formal Opinion No. 5–1964 (Formal Opinion). The absence of a legislative response to an Attorney General's formal opinion "strongly suggests that the views expressed therein were consistent with the legislative intent." *State v. Son,* 179 *N.J.Super.* 549, 555, 432 *A.*2d 947 (App.Div.1981) (citation omitted).

The Formal Opinion is particularly persuasive because the Destruction of Public Records Law applies to "public records" received for filing, indexing or reproduced by "any officer, commission, agency or authority of the State or of any political subdivision thereof[.]" *N.J.S.A.* 47:3–16. This language closely mirrors that of OPRA's definition of "government records." Here, the Association receives substantial financial support from the

public. Nearly $25 million in premium tax receipts were distributed in 2010.

The management of these revenues and expenditures—and the management of the accumulated assets exceeding $100 million—is an issue of public interest that OPRA was intended to address. The Association's financial management in turn is subject to the oversight of both the Commissioner of Banking and Insurance and the State Treasurer. Its benefit decisions are also subject to judicial review. The past instance of embezzlement of these publicly-sourced funds reinforces our conclusion that subjecting the Association to OPRA would fulfill the legislative intent to inform citizens interested in combating misconduct and corruption.

We reject as specious the Association's argument that it does not receive tax revenues. Beginning in 1885, the Legislature has recognized that the Association and local associations were beneficiaries of a tax, and the statutes so expressly state. *See, e.g.,* *N.J.S.A.* 54:18–2 (stating that the Association's treasurer "shall allocate the tax monies received to the appropriate local firemen's relief association"); *N.J.S.A.* 54:18A–2 (stating that "taxes paid to the treasurer of any firemen's relief association" shall be included in the tax imposed on non-life and non-marine insurance companies); *L.* 1885, *c.* 240, explanatory note to § 1 (describing payment to relief associations as a "tax on premiums").

Our courts have also recognized that the Association "is the recipient of tax moneys from the State of New Jersey[.]" *Taffey,* *supra,* 118 *N.J.L.* at 353–54, 192 *A.* 725. Indeed, in a prior case, the Association apparently argued that its revenues are taxes. *Magnus, supra,* 14 *N.J. Misc.* at 428, 185 *A.* 658 (noting "[a]ppellant's [the Association's] second point is that the moneys received by it are in the nature of tax moneys").

Further support that the Association is a public agency is found by examining the Association's functions. The Association serves numerous governmental functions aside from the receipt and management of tax revenues. It provides welfare benefits to a significant number of public servants—paid and volunteer fire-

fighters. Like other governmental relief and benefit programs, the benefits provide rewards and incentives for individuals who choose to serve their communities as firefighters. The Association also regulates the activities of other corporate entities—the local associations—and can exercise the power to seize a local association's assets. In these respects, it is reasonable to apply the definition of "instrumentality" that the Court used in *League of Municipalities, supra,* that is, the Association is "used to achieve an end or purpose," of the State, or is "[a] means . . . through which a function [of the State] . . . is accomplished." 207 *N.J.* at 503, 25 *A.*3d 1063 (citation and quotation omitted).

The governmental purpose exists, notwithstanding that most recipients are volunteers, and many recipients serve on fire companies that are not direct units of local government. *See Schwartz v. Stockton,* 32 *N.J.* 141, 151, 160 *A.*2d 1 (1960) ("While such organizations are independent, incorporated as associations not for pecuniary profit, . . . they may, and generally do, have definite relationships with municipal governing bodies, . . . thereby giving them a kind of semi-official status." (citation omitted)). Members of volunteer fire companies serve "under the supervision and control of [a] municipality and in performing fire duty shall be deemed to be exercising a governmental function[.]" *N.J.S.A.* 40A:14–68; *cf. State v. Quezada,* 402 *N.J.Super.* 277, 953 *A.*2d 1206 (App.Div.2008) (holding that a volunteer firefighter is a "public servant" under *N.J.S.A.* 2C:27–1(g)).

Additional evidence of the Association's public agency status is found in the regulations governing the local associations, which refer to the "public purposes reasonably related to the benevolent programs" conducted by the local associations. 27 *N.J.R.* 635. The Department of Banking and Insurance characterized the local associations as "quasi-public entities created by statute." *Ibid.* The Association itself previously argued that it was a public body, when faced with a challenge that it was the private recipient of unconstitutional gifts or donations. *Szabo, supra,* 230 *N.J.Super.* at 285 n. 15, 553 *A.*2d 371.

In sum, the Association, as an independent State instrumentality, is a public agency whose records are subject to inspection under OPRA. Given our conclusion, we need not reach plaintiff's alternative argument that the Association is an independent instrumentality created by a combination of political subdivisions.

Reversed and remanded. We do not retain jurisdiction.